MANTOOTH v. HOPKINS.

Opinion delivered January 20, 1913.

1. INFANTS—CUSTODY.—While the general rule is established that the father as the natural guardian of his child is entitled to its custody, courts will not always award custody of an infant to the father, but, in the exercise of a sound discretion, will look into the

peculiar circumstances of the case, and act as the welfare of the child appears to require. (Page 205.)

2. INFANTS—WHEN FATHER NOT ENTITLED TO CUSTODY.—A child of twelve will not be removed from the custody of a foster mother who has nursed it since its birth, and who is amply able to provide for the child, and given to its father, when the child expresses a desire to stay with its foster mother, and it appears that it would be an actual detriment to the child to give it into the father's custody. (Page 205.)

Certiorari to Jackson Circuit Court; *R. E. Jeffery,* Judge; affirmed.

STATEMENT BY THE COURT.

Some time in the year 1894 or 1895, petitioner, P. T. Mantooth, married Mary Turner, who lived at that time in Jackson County with respondent, Mary Vaught. Respondent had partially reared Mary Turner and had treated her as a mother would treat her own child. Some time after the marriage Mantooth and his wife moved to Franklin County, where they lived together until December, 1899, when they separated. There was a dispute as to the cause of the separation, the petitioner claiming that his wife had left him, while she claimed that he had left her unprovided for so that she was forced to leave to secure the necessities of life. She returned to her foster mother, the respondent, in Jackson County. At that time she was pregnant with the child which is the subject of this controversy.

The respondent waited on the mother of the child during confinement, giving her the care of a daughter, and thereafter cared for the child in suit as if it were her own, rearing it from infancy until the present time. She gave the child every attention that a mother could give her own child. She sent her to school regularly; the child was bright, learned well, and has advanced in her studies to the fourth grade.

At the time Mrs. Mantooth left her husband she had a boy whom she took with her to the home of respondent, Mrs. Vaught. After the child in controversy was born she and her brother continued to live at the home of Mrs. Vaught until Mrs. Mantooth married again, when she

took the boy with her to her separate home and left the child Mary with Mr. and Mrs. Vaught. The child Mary has lived with the respondent ever since.

When the decree for the divorce was entered the custody of the children was given to Mrs. Mantooth. Mrs. Mantooth died about two years before the institution of this proceeding. After her separation from Mantooth she always lived either with respondent or in the neighborhood.

Mantooth remarried after the divorce was granted and his second wife had four children, whose ages ranged from three to nine years. About a year after the birth of the girl in controversy the petitioner went to Jackson County and he then knew that she had been turned over to the respondent and that respondent was raising her as a foster mother. He was not present at the time the child in suit was born. He paid no attention at that time either to the mother or to the child. About five years before these proceedings were instituted he visited the girl one time and saw her and met her after that on two occasions, accidentally, in the city of Newport, and saw her one other time about two years before the present proceedings were instituted. These were the only times that he saw his daughter from the time of her birth until he brought this proceeding by *habeas corpus* for her custody.

At one time when he met his daughter in Newport he gave her $10, and that is the only sum he ever contributed towards her support and maintenance. He ''never sent her a Christmas present, nor bought her a book, nor a piece of ribbon,'' but he says the money he gave her would have bought it. He claimed that within the last two years he wrote to his child a few times but received no answers. The daughter, however, and the respondent claimed that no such letters were received. He manifested no solicitude or affection for his child. He claimed that the reason he did not take her home with him at the same time he took the boy was because she was in a comfortable home and in the hands of good people who loved her and who were amply able to take care

of her. At the time he came for his boy, according to the testimony of the respondent, he told her that he. didn't intend "to take the child away from her as long as she lived," but that as soon as she died he was going to come after Mary.

The petitioner testified that the reason he didn't take her at that time was because he saw that she was pleasantly surrounded, loved Mrs. Vaught and Mrs. Vaught loved her. He said as long as Mr. and Mrs. Vaught lived and no change took place they could have the child, that is, if the child changed hands he was going to take charge of her.

It is shown that petitioner had a farm of eighty acres unincumbered and personal property worth $500, and that he was able to support and educate the child. Vaught had died, Mrs. Vaught, the respondent, had intermarried with Hopkins, who was sixty-five years of age, and had three children, ages respectively eighteen, eleven and seven. Hopkins was a sober, industrious and intelligent man. Respondent owns forty acres of land for which she paid $2,100, and there is only a small balance due on the purchase money. She had $500 worth of personal property, and was able to take care of the child in controversy. It was shown that the petitioner had been in the habit of drinking several years past. His brother testified that his morals were fairly good. From his knowledge of petitioner, he testified that the child would be sent to school, to church and educated well and her morals looked after; that Mantooth had always been good about providing for his family.

The testimony on behalf of petitioner tended to show that he did not drink intoxicating liquor at the present time. He stated that he had not been in trouble recently, nor in the habit of drinking or getting drunk; that he had drunk some liquor ten or twelve years ago but that he didn't drink any intoxicating liquor now. The respondent testified that Mantooth "was drinking when he was at my house last Sunday."

The petitioner himself testified that he had known Mrs. Vaught for a long time and that she "certainly is a

good woman." Another witness testified that respondent had been "a perfect mother to the child from beginning to ending;" that he did not "think any mother could have treated her own child as good as Mrs. Vaught treated this child." Says the witness: "I don't know of any mother who has done that. She goes to school more because Mrs. Vaught has been able to spare her; she wears better clothes than the other girls in the neighborhod, she has all the books she wants." This witness further testified that Mrs. Vaught "is a good Christian woman, leads a Christian life and trains this child to lead such a life."

The girl herself testified as follows: "I am in the fourth grade. I go to church. Calls Mrs. Vaught mother. She buys me nice clothes and feeds me and gives me a good education. I know of girls in the neighborhood that have mothers and she treats me as good as they do their children. She teaches me to mind her, to do things around the house, and I feel like she was my own mother. I remember seeing my father two years ago when he came to get my brother, and before that time I saw him at Newport twice. I know his present wife; saw her once and have seen the two least children. I would rather live with mamma (respondent); she is sure good to me."

The above are substantially the facts as developed in the proceedings instituted by the petitioner to recover from the respondent the possession of Mary Mantooth, the child in controversy, and upon which the circuit court found the following:

"That respondent has had the care, custody and nurture of the said child, Mary Mantooth, from its birth until now, with the assent of its father, the petitioner. During all the twelve years of its life petitioner has contributed practically nothing to it; and further finding that the child has been well cared for and well reared, and that respondent is amply able to care for and educate said child, and it being admitted by petitioner that respondent's home is in every way suitable for said child, and it being further found that on account of the neglect

by petitioner of the said child and his abandonment of her, he has forfeited his right to her custody as the natural guardian, and the welfare of the child is best subserved by leaving the custody of said child with the respondent.'' The court thereupon rendered the following judgment: "It is therefore ordered that the custody of the said Mary Mantooth be denied said petitioner and is hereby awarded to said respondent, with leave, however, to petitioner to visit said child at all reasonable times.''

The petitioner brings up the proceedings for review here by certiorari.

*John W. & Joseph M. Stayton,* for appellant.

1. The respondent and the child are strangers in blood, the former being but a foster mother to the child's mother. The fact of petitioner's having left the child with respondent, a thing for which he was not primarily responsible, does not evidence a lack of affection on his part, nor does the fact that his contributions were small to her support or pleasure, where such contributions were not necessary nor expected, argue such lack of affection. Whatever ties of affection have been formed between the respondent and the child were formed through the act of the mother in leaving her in the custody of the respondent and the father is not to be held accountable therefor. Finally, the relations between the two are materially changed by reason of respondent's marriage.

The father, however humble his circumstances, if of good moral character and able to support the child in his own style of life, is preferred in law over strangers. 37 Ark. 29, 30; 105 Ark. 180; 50 Ark. 355; 78 Ark. 193; 82 Ark. 467; 89 Ark. 501; 95 Ark. 355; 32 Ark. 96.

2. A parent can not by contract or agreement relinquish the right to the custody of his child. 105 Ark. 180; 29 Ark. 279; 50 Ark. 352; 22 Ark. 92.

*Jones & Campbell* and *Sam Frauenthal,* for respondent.

The record conclusively shows that the judgment of the lower court was right, and its every finding is sustained by the evidence and supported by the law. Petitioner's theory that the father has the absolute right to the custody of the child is not the law. 26 Kan. 657; 3 Mason, 435; 37 Ark. 27; 50 Ark. 351; 78 Ark. 193; 89 Ark. 501. From these cases it clearly appears that while preference is shown to the rights of the parent, yet the paramount consideration is the welfare and interests of the child. See also 42 Mich. 509; 16 L. R. A. 681; 20 L. R. A. 199; 68 Ala. 299; 56 Am. St. Rep. 166; 68 Ga. 650; 8 Paige (N. Y.), 47; Hurd on Habeas Corpus, 529; Church on Habeas Corpus, § 447; 45 N. J. Eq. 283.

WOOD, J., (after stating the facts). The general rule is well understood and well established that the father as the natural guardian of his child is entitled to its custody. The petitioner invokes this rule as it has been recognized in various decisions of this court, including *Bowles* v. *Dickson,* 32 Ark. 96; *Verser* v. *Ford,* 37 Ark. 29; *Warsaw* v. *Gimble,* 50 Ark. 351; *Coulter* v. *Sypert,* 78 Ark. 193; *Lipsey* v. *Battle,* 80 Ark. 289; *Wafford* v. *Clark,* 82 Ark. 467; *Baker* v. *Durham,* 95 Ark. 355; and *Waldron* v. *Childers,* 105 Ark. 180. But an examination of the cases will discover that while this general rule is recognized and announced there are exceptions to it and it is varied all the way through the cases according to the circumstances of each particular case as it may arise. For instance, in *Verser* v. *Ford, supra,* the court, after announcing the general rule, says: "Nevertheless, keeping these leading principles always in view, there are exceptional cases, depending on their own circumstances, in which the sovereign power of the State as *parens patriae,* acting through the chancellor, has interfered so far as may be necessary to afford the child reasonable protection. And, further: "Only a few general principles can be taken as guides, subject to which the chancellor must exercise his judgment upon the peculiar circumstances of the case, and act as humanity, re-

spect for the parental affection, and regard for the infant's best interests may prompt. All three should be considered; neither ought to be conclusive.''

The principles which should control under the facts of the present case are quoted by Judge BATTLE in rendering the opinion of the court in the case of *Coulter* v. *Sypert, supra,* as follows: ''When, therefore, the court is asked to lend its aid to put the infant into the custody of the father and to withdraw it from other persons, it will look into all the circumstances and ascertain whether it will be for the real, permanent interest of the infant; and if the infant be of sufficient discretion, it will also consult its personal wishes. It will free it from all undue restraint and endeavor as far as possible to administer conscientious duty with reference to its parental welfare. It is an entire mistake to suppose that a court is at all events bound to deliver over an infant to its father, or that the latter has an absolute vested right in its custody.''

In *Warsaw* v. *Gimble, supra,* the father attempted to obtain the custody of his child from one in whose care it had been placed upon the death of its mother by the pastor of the church to which all the parties belonged. The court, in affirming the judgment of the lower court denying the father the custody of his child under the peculiar circumstances of the case, said: ''The circuit judge had the witnesses, the parties and the child before him and was charged with the exercise of a sound discretion in disposing of the question.''

In *Verser* v. *Ford, supra,* the contest was for the custody and nurture of an infant girl of tender age whose mother died at her birth and who for the first two or three years of her existence had been cared for and kept by the grand parents. The father having again married and being in circumstances to provide and care for the infant sought its custody. The father was a moral man and with means necessary for discharging his parental obligations. In that case, among other things, the court said: ''The child was placed where she is by the father's assent, and has so remained. By his assent ties have

been woven between the grandmother and the grand-daughter, which he is under strong obligations to respect, and which he ought not to tear assunder. He has shown no urgent necessity for present action and his appeal to the circuit court for aid was not such as to enlist in most hearts any very strong sympathy."

While the preferential right of parents as the natural guardians of their children entitling them to their custody, will always be respected and enforced as between them and relatives or strangers to the blood, unless there are some special circumstances calling for a different disposition of them, still whenever these circumstances arise the court will give force to them and will not treat the right of the parent as proprietary and as absolute and uncontrollable. *Chapsey* v. *Wood,* 26 Kan. 657; *United States* v. *Green,* 3 Masons, 482.

Applying the rules that should govern in cases of this kind to the facts of the present record, we are of the opinion that the judgment of the circuit court was correct in denying to the petitioner the custody of his daughter. He had permitted the tenderest ties of affection to grow up between the respondent and the child. The girl had known no other mother during her whole life and she could not have been more tenderly and affectionately nurtured and cared for by her own mother, as the witnesses stated, than she was by respondent. The girl had arrived at the age of discretion and was intelligent and capable of exercising good judgment as to her own present surroundings and her own future welfare and happiness. She was unwilling to leave the roof-tree of the foster mother whom she loved devotedly to go to the abode of her father, and certainly, considering the best interests of the child, we can not say that such a change would have bettered her condition in life; and when the rights and interest of the father are considered he is not entitled to sunder the tender and sacred relations which he permitted to grow up between the respondent and his daughter. "He is under strong obligations to respect these" relations. Although the custody of the child was by the decree of the court granted to the

mother, yet she very soon thereafter relinquished such custody to respondent. When this was done, petitioner could have applied to the court for the custody of his child. It was his duty to have done so then if he ever intended to do so. But instead, he has waited until the strongest bonds of reciprocal love now bind the foster mother and child, which, to both alike, it would be cruel in the extreme to sever. For twelve years he has permitted the respondent to undergo the expense and trouble of nurturing, supporting and educating his child. He has manifested no concern in relieving respondent of the financial burden, as well as the physical labor and the anxiety that such a charge necessarily entails. During all these years, the paltry sum of ten dollars (less than one dollar per annum), represents the sum total of his material contribution to his daughter. Other than this, not a treasure, not a trinket, nor even "a ribbon for her hair" has little Mary received as a birthday or Christmas token of her father's remembrance, much less love. Therefore he is entitled to but little consideration from a sentimental viewpoint. He could and should have more assiduously cultivated the affections of his own child and not by indifference and neglect have permitted the tendrils of her young heart to be entwined about respondent as if she were the only parent, and the only one for her to love and obey as such. Now that the child has arrived at the age where she can be useful to petitioner and to his wife and children in the family circle, he is anxious to secure her custody. This doubtless would be expedient for and beneficial to him, but, as we view the evidence, it would be detrimental to the child and a rank injustice to the respondent. Thus far he has manifested no such appreciation of, or affection for his own offspring as to give promise that he would care for her with as much love and solicitude as the foster mother has done and will continue to do. The court was fully warranted in holding him to the promise which the respondent says he made her, when he said, "I don't aim to take Mary away from you as long as you live."

Petitioner contends that the marriage of respondent

to Hopkins has so changed the condition of the child as to warrant him in asking for her custody. But there is nothing in the record to show that the marriage has altered in any manner the relationship between respondent and the child, or changed her condition for the worse. If at any time in the future by reason of this marriage, or for any other cause, the circumstances make it necessary for petitioner to apply for the custody of his daughter, nothing said herein will bar him from that privilege.

The judgment is therefore affirmed.