TUCKER *v*. TUCKER.

4-7364                                     180 S. W. 2d 571

Opinion delivered May 29, 1944.

*Claude F. Cooper* and *T. J. Crowder,* for appellant.

*Arthur L. Adams,* for appellee.

KNOX, J. This is a proceeding by *habeas corpus* instituted by appellant, the mother, to recover from a paternal uncle and his wife, custody of two infants, a girl age 10 years, and a boy age 8 years. At all times mentioned herein appellant has resided in Memphis, Tenn. Appellees now reside in Jonesboro, Ark., having formerly lived in Blytheville. The father of the children died in the fall of 1939, but prior thereto, to-wit on July 5, 1938, appellant had obtained a decree of divorce, awarding her the custody of the children. The record discloses that when the little girl was two years old, and at different times thereafter when the father would be out of work, appellees, responding to requests by the parents, kept her for periods extending over several months, and then the parents with little or no notice would take her away.

On November 7, 1939, after the decree of divorce, but before the death of the father, appellant wrote appellees explaining in detail the difficulties which confronted her in providing for the children, and said "I just wonder if you all would consider keeping them for me, and if you can't keep both would you consider keeping him . . . I have no relatives here and mother travels so I have no one to fall back to and I had much rather you all had them than have them in the home. I would be willing to buy their clothes and I would come to see them, but I promise you I will not take them away

from you on a few hours' notice like we have, but should you keep them for me, Tuck is not to take them away from you because in my divorce I got custody of them and I have kept them for almost three years without his help, but I have come to the place where I can't go on. So should you consider this, please answer by return mail.''

Yielding to appellant's intreaties appellees assumed the care and custody of the little boy. Appellant placed the girl in an orphans home in Memphis, where she remained until appellees made a place for her in their home. For two years the little girl, and for nearly four years the little boy, had resided with appellees when this proceeding was commenced.

Appellant testified that at the time she ''felt it was better'' for the children that they be placed with appellees because they could give them a better home than she could on the wages she was then receiving; that she knew they would be given a good home; that while she at no time desired to be separated from the children she decided it was for their best interest that they be placed in the custody of appellees. Asked what change had occurred to make it now better that she take the children she replied, ''Because I am making more money and am financially able to take care of them.'' At the time the children were placed with appellees appellant was employed by True-Tagg Paint Co., and was earning $10 or $12 per week. In April of 1942, appellant obtained employment in a war plant as a riveter, where she receives 94 cents per hour for 40 hours per week, and time and one-half for overtime. Ordinarily she works 48 hours per week, so that her gross annual income is approximately $2,500, from which certain deductions are made for social security taxes and bond purchases. Appellant testified that during the fifteen months of increased earnings immediately preceding the filing of this suit she supplied for both children clothing of the value of $134.88, and Christmas and birthday gifts of the value of $58.15,

and that other sums necessary for the support of the children were supplied by appellees.

Appellant's present employment requires that she work at night, between the hours of 12:06 and 8:06 a. m. Admitting that she would have to continue working in order to support the children, she testified that she had received assurances that in case the children were awarded to her she could and would be transferred to a daytime shift.

Appellant, a Mrs. Reed, and Mrs. Reed's adult daughter, who is employed as a bookkeeper, share a four-room apartment. Both Mrs. Reed and appellant expressed the hope that larger quarters might be found, but each admitted that Memphis was crowded and suitable living quarters were quite difficult to obtain. Appellant's mother, who as she expresses it, "does mission work" in the Pentecostal Church, but denies that she "preaches on the streets," testified that she might move to Memphis and help look after the children, but declined to give positive assurances until she had first received further directions from the Lord. Mrs. Reed, who is 60 years of age, testified that she would be willing to look after the children in the absence of the mother and grandmother.

The response filed herein alleges two attempts, one by appellant's mother, and one by appellant herself, to abduct said children, and take them out of the jurisdiction of the court. The evidence relating to these allegations is in sharp conflict and the trial judge made no specific findings of fact thereon.

The response also contains allegations to the effect that appellant is an unfit person to have the custody of the children. The trial court likewise made no specific finding as to this allegation. There is in the record evidence tending to support an inference that in the selection of and association with certain of her friends, both women and men, appellant failed to exercise that degree of care which doubtless would have been exercised by a woman who was determined that her reputation should

be above suspicion. To her credit, however, many witnesses, who have known her long, give unqualified assurance of her sterling character.

Appellee C. C. Tucker is 39 years of age, employed by Banner Feed & Flour Co. He and Mrs. Tucker were married in 1930, their only child died in infancy.

The record clearly discloses, and appellant admits, that appellees have furnished these children a suitable home, and properly provided for their physical, mental and spiritual growth and welfare. To supply larger living quarters, as well as a yard in which the children could play, appellees at the time the little girl came to them, moved from an apartment to a large house in a good neighborhood, where association with suitable playmates would be assured. The children have been kept in school, and their reports show excellent progress. They attend church and Sunday school. Mrs. Tucker does her own housework and remains at home where she can and does look after the needs of the children. Both appellees testified that they love these children as if they were in fact their own. The children apparently return that love with equal ardor. In fact the little girl testified to her love for appellees and expressed a strong desire to remain in their household.

Appellant testified, and Mrs. Casper Tucker denied, that the latter had admitted that her intentions were to poison the minds of the children against the mother. It is admitted that the little boy was not aware until shortly before the filing of this suit that appellees were not his parents, but appellees testify that this was in accordance with appellant's desires. Appellant at all times was permitted to see the children and the boy could not have been kept in ignorance of his parentage without her participation in the deception.

Counsel for appellant assert that ''The only question to be considered by this court or any other court, is is Eula Tucker, the mother of the two children, so poor and so incapacitated to work that she cannot provide the physical comforts essential to the life of her two children,

comparable with her situation in life; or is she so depraved and immoral that the lives and well-being of her children would be endangered.'' In support of this argument counsel rely upon the case of *Loewe* v. *Shook,* 171 Ark. 475, 284 S. W. 726, where it is said: ''There can be no question in the law that, as between a mother and grandparents, the mother is entitled to the custody of her child, 'unless incompetent or unfit, because of poverty or depravity, to provide the physical comforts and child.' *Washaw* v. *Gimble,* 50 Ark. 351, 7 S. W. 389; *Baker* v. *Durham,* 95 Ark. 355, 129 S. W. 789.'' The language set forth in the inner quotation is taken from *Baker* v. *Durham, supra,* but in that case the words were preceded by words declaring that as between a parent and a third person ''the law *prefers* the former'' and not that the parent ''is *entitled* to the custody.'' In the *Baker* v. *Durham* case, Mr. Justice Wood pointed out that there are cases where the parent ''has voluntarily relinquished these parental obligations, privileges and pleasures to other hands for so long that the court will refuse to disturb the association and environments which his own conduct has produced, and will leave in the *statu quo* those whom he has thus permitted to stand in *loco parentis. Coulter* v. *Sypert,* 78 Ark. 193, 95 S. W. 457.''

*Washaw* v. *Gimble,* 50 Ark. 351, 7 S. W. 389, the other case cited in support of the declaration contained in *Loewe* v. *Shook, supra,* not only fails to declare that the court's inquiry is limited to the financial ability and moral fitness of the parent, but on the contrary declared ''the child's welfare is the cardinal point of inquiry,'' and the court in that case declined to restore to an admittedly moral and worthy father the custody and control of an infant, who with the father's consent, had been placed, and for sometime had been allowed to remain, in the home of and as a member of the family of others, where strong ties of affection had grown up.

In the early case of *Verser* v. *Ford,* 37 Ark. 27, a father's petition to have his minor child taken from the custody of the maternal grandmother and restored to him was denied, although the opinion recites that ''The

father has shown himself to be a moral man, with the means of discharging his parental obligation.''

Many decisions (rendered both before and after *Loewe* v. *Shook*) are to be found where the court declined to restore the custody of an infant to a parent who was morally fit, and financially able to establish and maintain a suitable home for the child. When the language employed in *Loewe* v. *Shook* is read in the light of these cases it is apparent that the court did not by that decision change the rule announced in the earlier cases. Moral fitness and financial ability remained, as before, proper, but not the only, nor even paramount, subjects of inquiry. All doubt, if any existed, must necessarily have been removed when in *Massey* v. *Flinn*, 198 Ark. 279, 128 S. W. 2d 1008, a contest between a father and an aunt, it was declared ''We do not think that the fitness or competency of the father is the only criterion by which to judge his right to the custody and control of his child.''

In the case last cited it was said: ''We recognize the general rule that ordinarily the parent of the child is its natural guardian and is entitled to its care and custody, however, this is not always true. There are exceptions. Of prime concern and the controlling factor is the best interest of the child.

''The rule is laid down in *Johnston* v. *Lowery*, 181 Ark. 284, at page 287, 25 S. W. 436, by this court in the following language: 'The law recognizes the preferential rights of parents to their children over relatives and strangers, and where not detrimental to the welfare of the children, they are paramount, and will be respected, unless special circumstances demand that such rights be ignored. *Herbert* v. *Herbert*, 176 Ark. 858, 4 S. W. 2d 513; *Loewe* v. *Shook*, 171 Ark. 475, 284 S. W. 726.

'' 'The courts will not always, however, award the custody of an infant to the father, but, in the exercise of sound discretion, will look into the peculiar circumstances of the case, and act as the welfare of the child appears to require considering primarily three things: (1) Respect for parental affection, (2) Interest of humanity generally, (3) The infant's own best interest.' ''

The court seeks to insure the permanent welfare instead of temporary benefit of the child. *Kirk* v. *Jones,* 178 Ark. 583, 12 S. W. 2d 879; *Coulter* v. *Sypert,* 78 Ark. 193, 95 S. W. 457; *Mantooth* v. *Hopkins,* 106 Ark. 197, 153 S. W. 95. If these children are now taken from them it is unlikely that appellees could be induced to risk a recurrence of the pains of separation and again assume their care if later appellee found herself again unable to earn enough to provide for them. The trial court doubtless considered this fact, and felt that the period of appellant's increased earnings did not cover sufficient time, nor reflect economic conditions sufficiently varied to supply a suitable yardstick with which to measure her probable future earning capacity, and for that reason was of the opinion that custody should not be transferred, until and unless a longer and more varied experience should indicate the probability of a sustained substantial earning capacity on her part.

But for her increased earnings there is little difference in conditions existing now and those which existed at the time appellant so eagerly sought a place for these children in appellee's home. Appellant admittedly would have to work, and, therefore, could not give these children the amount of personal care and attention that they now receive from Mrs. Casper Tucker. There is no certainty that appellant's mother would move to Memphis—so during the hours appellant was working, or resting, the children's activities would be superintended by one not related by blood or marriage. Both children, and especially the little boy, need the attention of one who stands in the relation of a father—this need would go entirely unsupplied. For the present, at least, five, and possibly six, persons would have to accustom themselves to the crowded quarters of a four-room apartment, where the children with only the memory of a large house, surrounded by a big yard, where they and their friends played, would have to set about acquiring new friends, and making a new life for themselves. As was pointed out in *French* v. *Graves,* 205 Ark. 409, 168 S. W. 2d 1108, it is proper in these cases for the trial court to take "into consideration the harm that might be wrought to a child

. . . by taking it from surroundings to which it had become accustomed and transferring it in a strange and unfamiliar atmosphere." Even more emphasis should be placed upon this circumstance, where, as here, the children not only by their conduct display an emotion bordering on fear at the suggested change, but the older child, when consulted as to her preference in the matter, unqualifiedly expressed her desire to remain with appellees. Because of her age and discretion such inquiry was properly made. *Coulter* v. *Sypert, supra; Jackson* v. *Clay,* 89 Ark. 501, 117 S. W. 546; *Mantooth* v. *Hopkins,* 106 Ark. 197, 153 S. W. 95; *Lipsey* v. *Battle,* 80 Ark. 287, 97 S. W. 49.

No censure attaches to appellant for having placed these children in the care and custody of appellees. Doubtless the self-imposed separation from her children was no easy task, and she endured it only because she knew the welfare of the children was being thereby better protected and promoted. Her desire to now regain these children is both understandable and commendable. After a full hearing, however, the trial judge, in the exercise of the discretion vested in him, and acting as to him appeared the welfare of the children required, and giving consideration to the three cardinal tests above outlined, found that it was for the best interest of the children that their custody be retained by appellees. We cannot say that the judge abused the discretion, or erred in so awarding custody to appellees. Appellant's petition is, therefore, denied.