John A. Fogleman, Justice. Barbara Smith Cousins, the mother of Melissa Gail and Kimberly Ann Smith, aged 6 and 3 respectively, contends that the chancery court erred in denying her custody of her children. Appellant and Jimmy Wayne Smith were married June 11, 1965, and divorced March 5, 1971, by decree entered in the Superior Court in Elkhart, Indiana, which awarded custody of the children to appellee and permitted him to remove them to Ohio, the state to which he had then removed and where he now resides. The children had been in the custody of their father since March 1970, and had remained there until June 9, 1972, when they came to visit appellant in Fort Smith, pursuant to a stipulation entered into between their parents on February 16, 1972, giving appellant certain visitation rights. On July 5, 1972, during this visit, appellant petitioned the Chancery Court of Sebastian County for a writ of habeas corpus awarding her custody. Appellee responded, contending that he was legally entitled to custody of the two daughters. Appellant’s petition was denied because the chancellor found that there had been no substantial change in circumstances since the date of the stipulation. As appellant states, the Arkansas court had jurisdiction to change custody of the children if there was a substantial change in conditions and if the best interest of the children required it.[1] See Hamilton v. Anderson, 176 Ark. 76, 2 S.W. 2d 673. Appellant based her claim to custody upon allegations that the children were unlawfully in the custody of Smith, that she had been deprived of them through the fraud and deceit of appellee and that there had been a substantial change in conditions since the divorce decree in that she had remarried and could now provide them a good home, but previously she had no home for them. In support of her allegations, appellant (then 24 years of age) showed that she and her present husband were living in a good neighborhood in a $40,000 home in which there were three bedrooms and 2 1/2 bathrooms, that her husband had an income of $20,000 per year, that since it was unnecessary for her to work she could spend all her time with the children, that the children attended Sunday School and church regularly while with her, that her husband was interested in the children and could support them, and that the children seemed healthy, happy and well adjusted in her home. Mrs. Cousins expected the birth of another child in November 1972. The divorce decree was entered in a suit brought by appellee upon default by appellant. Although she contends that she had no notice of this decree and admittedly had been assured by appellee at one time that he would dismiss the case, she obviously knew that the suit had been filed and had known that a decree was rendered at least since May 1971. It was then that she consulted an attorney in Fort Smith about obtaining a divorce. Apparently, he had no difficulty in ascertaining that the divorce decree had been entered in Elkhart. So far as the record discloses, appellant has never taken any steps to do anything about this decree and in reliance on it seems to have accepted an engagement ring June 1, 1971, from her present husband whom she married October 9, 1971. She then went to Cincinnati, Ohio, where appellee was living to visit the children in November 1971, and had visited them there in April 1971. She admitted that there were no problems connected with her visitation. After the separation of the parties, the children had been turned over to appellee by appellant because, according to her, she could not support them, and he would not contribute.[2] Appellee said that he did not contribute because he had no job, having been laid off from his employment, and because appellant was spending the money on another man instead of the children. Appellee admitted that when appellant called him to come get the children she attributed her difficulties to his failure to contribute, but also testified that appellant’s mother and father asked him to take the children. He also testified that appellant told him that she was going to turn them over to the welfare department. Appellant’s first efforts to procure a change in the custody arrangement took place immediately after appellee’s remarriage on December 31, 1971. In February 1972, she filed an action in Juvenile Court in Cincinnati to obtain custody of the children. Either shortly before or shortly after the Juvenile Court action, she filed a suit relating to the matter in domestic court there. She testified that the first step was for visitation rights only. As a compromise of these two actions, in which their respective attorneys participated, the parties signed a stipulation dated February 16, 1972, subject to the approval of the Indiana court. It recited the agreement of the parties that the mother would have the children in Arkansas each year during the summer months and return them to their father in Ohio each fall one week prior to the commencement of school. The stipulation expressly recited that it should not be construed as changing custody of the children in the absence of further stipulation of the parties or further orders of the Indiana court, but that its purpose was to define in detail the visitation privileges granted appellant in the decree of divorce dated March 5, 1971.[3] Mrs. Cousins testified that the stipulation was filed in Ohio in connection with her petition for custody, but that “they had to take it to Indiana to get it completed.” Appellee testified that appellant told him that she would waive custody rights if he would enter into an agreement for visitation. We agree with the chancellor that there has been no change in circumstance since February 16, 1972, substantial enough to justify changing the custody of these two little girls, who had been with their father for nearly 2 1/2 years, beginning when the youngest was less than a year old. Appellant says that the different circumstances justifying a change are her removal from an apartment where children were permitted to visit, but not to live, to a home purchased by her and her husband in February 1972, but which was not a suitable home for the children until the first of June, because it was not completely furnished until then. She also testified that both children had dental problems when they arrived in Fort Smith which had passed unnoticed by their father and stepmother, and that the older daughter was infected with some type of poison ivy or weed rash, was wearing shoes too small for her feet and was, upon her return to Ohio in August, scheduled to have a tonsil operation which a Fort Smith pediatrician had told her was unnecessary. We are unable to say that the welfare of these children is in jeopardy by reason of their being in the father’s custody, as they have been for such a significant period in their lives. At 26 years o£ age he had become a supervisor and detail guardsman at Castle Manufacturing Company, earning $12,000 per year. He lives in a two-bedroom, two-bath, well furnished apartment for which he pays $176 per month rent unfurnished. His sister looked after the two little girls for him during the preceding winter, but they were left with a neighboring lady babysitter for two months from 8:00 a.m. to 5:30 p.m., while appellee and his wife were at work. Melissa attended kindergarten from September 9, 1971, to April 19, 1972, and school in Springdale, Ohio, from April 19 to June 9. Appellee’s wife was employed by a business forms company at a salary of $156 per week at the time of the hearing, but planned to quit her job after the birth of her own child, expected in October 1972, in order to look after the children. She professed to love these children and to have a good relationship with them. Mrs. Smith said that she had been saving her salary for a down payment on a house, but that the fund had been used to defray the expenses of the custody litigation. Appellee’s expression of a possibility that the wife might have to return to work this year was based upon the possibility that this litigation might be prolonged. Perhaps the matter of greatest concern is the contrast in church attendance habits in these homes. The children are taken regularly by their mother, but appellee depended upon his sister to take them when she had them, and neither he nor his present wife has attended church since their marriage. It is noteworthy that appellant made no complaint about the condition of the children when she visited in Ohio, even though she now seems concerned that her former husband when testifying could not remember the name of the children’s baby-sitter. His present wife readily gave her name. Regrettably, tooth cavities among children do occur from time to time, and the necessity of treatment of a cavity of one child on July 18, 1972, and the discovery of a cavity in a tooth of the other on August 9 are not indicative of such gross parental neglect prior to June 9 to justify serious concern about the welfare of the children in their father’s home. Although the mother said Melissa’s shoes were so small that it was necessary to replace them as soon as she arrived, the father said that he and his wife had just purchased new shoes and new summer outfits for the children. His present wife, then 21, and without previous experience in child care, except for baby-sitting, testified that she tried to get shoes of the right size for Melissa. A shoe clerk’s error should not be a factor demanding that these children be taken from their father; nor should a difference of opinion among physicians relative to a tonsillectomy and adenoidectomy. It is significant that the Fort Smith pediatrician admitted that he would not have taken issue with the Cincinnati doctor if the operation had been scheduled immediately rather than postponed to August. Not only are we unable to say that the welfare of these children was jeopardized by leaving them in the custody of the father, we cannot say that the matters recited above constitute a significant change of circumstances. In the first place, the acquisition of the new home could not really be considered a change. An investigating social welfare caseworker testified that the Cousinses lived in the apartment until February 1972, and that their position had been basically the same during the year preceding her testimony. Jerry Cousins, appel]ant’s present husband, confirmed the fact that they had moved into the new home in February 1972, even though he said it was May or June until it was livable because they did not have such things as a refrigerator. Neither Mrs. Cousins nor her husband gave any reason for their delay in completing the furnishing of their home. At 26 years of age he has an annual income of $20,000, and is a junior officer in the Van Burén factory of a family-owned furniture business, which is the largest employer in Fort Smith. In spite of appellant’s statement that she did not know about the acquisition of the home when the settlement was negotiated, we cannot say with any assurance that the acquisition and establishment of this home was uncontemplated or could not have been made known when the stipulation was signed, or that it would not have been established and furnished sooner if the welfare of these two little girls were a cause for concern or a dominant factor. One of the most important considerations in our review is the superior position of the chancellor, who had considerable opportunity to observe the parties and their present mates, as well as the other witnesses. There is perhaps no type of case in which the chancellor’s decision carries as much weight. Not only must we give weight to his determination of credibility, we also recognize his ability to observe and otherwise evaluate the parties, their personalities and their apparent interest and affection or lack of affection for the children. Standridge v. Standridge, 248 Ark. 392, 451 S.W. 2d 726; Holt v. Taylor, 242 Ark. 292, 413 S.W. 2d 52; Wilson v. Wilson, 228 Ark. 789, 310 S.W. 2d 500. We are not impressed with appellant’s arguments that we should survey changed circumstances by reference to the original divorce decree. Any such argument is foreclosed by her entering into the stipulation to terminate the Ohio litigation, which was approved by the Indiana court. We have little doubt that at least one of the Ohio actions was a custody suit. Regardless of the nature of the litigation, we cannot believe that appellant would compromise it by a surrender of these children to an unwholesome and unhealthy situation even as a temporary expedient or as a means of obtaining some advantage over appellee by . reason of the location of the ultimate forum. We might well consider that the courts of this state were not bound, either by the Indiana divorce decree or the compromise of the Ohio litigation and its resulting effect on the Indiana decree, if we could be satisfied that the return of these little girls to their father was a serious hazard to their welfare, and that there were significant factors not made known to the courts in those states. But, as herein demonstrated, we are unable to do this. We can only hope that the interest expressed by both in the welfare of these two children will be strong enough to eliminate any temptation to future recriminatory action. The evidence indicates that both these parents have matured considerably since the fracture of their marriage. Since we cannot say that the chancellor erred as a matter of law or that his finding was against the preponderance of the evidence, his decree is affirmed. Harris, C.J., and Brown and Holt, JJ., dissent. We find it unnecessary to pass upon the jurisdictional question raised by appellee. But see, Shaw v. Shaw, 251 Ark. 665, 473 S.W. 2d 848. It is difficult to harmonize appellant’s testimony in this regard. She testified that prior to the divorce Smith came to get the children just to visit him during the summer, but that he failed to return them, and when she called his place of employment in Indiana he had left. She also stated that he once returned the children to her but failed to support them, and then took them for a three-day visit but failed to return them. According to appellant, this stipulation was approved by the court but no hearing was had or order of approval entered.