Janet KNIGHT, Family & Children's Services
of Arkansas Social Services, and Wanda HALL *v.*
Delbert R. DEAVERS and Mary Betha DEAVERS

75-152                                          531 S.W. 2d 252

Opinion delivered January 12, 1976

*Highsmith, Tatum, Highsmith, Gregg & Hart*, for appellants.

*Murphy & Blair*, for appellees.

JOHN A. FOGLEMAN, Justice. This appeal comes from the refusal of the chancery court to specifically enforce an agreement by foster parents with whom the Family & Children's

Services of the Arkansas Social Services had placed Kimmi Jo Bullock. We find no error and affirm.

The litigation was spawned by the filing of a petition on September 5, 1974 by appellees Delbert R. Deavers and his wife Mary Betha Deavers to adopt Kimmi, who was born August 23, 1969. It was alleged in the petition that the whereabouts of Kimmi's mother were unknown. A written consent to the adoption by R. C. Bullock, her father, was filed with the petition. Appellant filed an intervention in the adoption proceeding on October 3, 1974. She alleged that the consent of of neither the mother, the father nor Arkansas Social Services, to whom the custody of Kimmi had been awarded by the Juvenile Court of Sharp County on October 2, 1972, had been obtained, that the petitioners had agreed in writing, when the child was placed in their home on or about June 22, 1972, that they would not attempt to adopt the child and that the petitioners were not financially able to adopt or properly care for the child. On October 5, 1974, a written consent of Kathy Bullock, the child's mother was filed. Appellees responded to the intervention, alleging that the agreement relied upon by appellant was invalid because it contravened public policy and constituted an attempt to contract away the jurisdiction of the probate court over the matter of adoption.

On January 13, 1975, a written revocation by R. C. Bullock of his consent to the adoption was filed. It was stated therein that Bullock did not comprehend or understand the nature and contents of the consent he had signed. Appellees responded by amending their petition to allege that R. C. Bullock had abandoned Kimmi for more than six months prior to the filing of the petition for adoption, so his consent was not necessary. Appellant denied the allegations of this amendment.

On October 16, 1974, the Family & Children's Services of Arkansas Social Services filed a complaint in the Chancery Court of Fulton County asking that appellees be enjoined from seeking the adoption or mandatorily enjoined to specifically perform their contract that they would not attempt to adopt Kimmi. The allegations of appellant's intervention in the adoption proceeding were repeated in this

complaint with the additional allegation that the agency had been awarded custody of Kimmi prior to June 22, 1972, by emergency order of the Juvenile Court of Sharp County and that the child was then placed in the home of appellees, as foster parents on the basis of the contract relied upon. It was also alleged that the final award of custody by the juvenile court made her a ward of the state, as a dependent and neglected child. After appellees demurred to this complaint, the causes in the probate and chancery courts were consolidated for hearing. R. C. Bullock was granted permission to intervene. Bullock denied that he had abandoned the child and asked custody of her. While the hearing was in progress, Family & Children's Services filed a petition alleging that a guardian of the person and estate of Kimmi should be appointed and nominated Wanda J. Hall, a service specialist with Arkansas Social Services in Fulton County.

An interlocutory decree of adoption was entered in February 1975, after the chancellor had heard both the probate and the chancery case simultaneously. In the same order he denied the petition for guardianship, held the contract between the Arkansas Social Services and appellees void, declined to decree specific performance of the contract, saying that, even if it was valid, specific performance, under the circumstances of the case, would be against public policy. He also found appellees morally fit and physically and financially able to furnish suitable nurture and education for Kimmi. Appeal from the interlocutory decree of adoption is not before us, and it may have been premature. Appellants have confined their attack here to the chancery court's order denying specific performance on the following point:

THE TRIAL COURT ERRED IN REFUSING TO SPECIFICALLY ENFORCE THE FOSTER CARE PLACEMENT AGREEMENT AND IN DENYING THE GUARDIANSHIP TO ARKANSAS SOCIAL SERVICES.

Delbert Deavers is 61 years of age and Mrs. Deavers is 59. They have been married for 40 years and have resided in Mammoth Spring since 1962. He has been a Baptist minister since October 2, 1948 and the pastor of the Mammoth Spring

Central Baptist Church since September 3, 1961. He also had full-time outside employment until July 3, 1974, but not thereafter. Except for a year and a half that he lived at Thayer, Missouri, Delbert Deavers has lived in Arkansas approximately a quarter of a century. Other places of residence were at Walnut Ridge and Salem. He owns his dwelling house valued at $22,000 and has a total monthly income of $390 - 395 with no obligations other than normal living expenses. A substantial part of this income is interest on savings of $17,000 and another portion from "odd job" employment. Fifty-seven dollars a month was unemployment compensation. Neither of the appellees has any significant health problem. They have no living children. Their only child died when about five months old. During the time Kimmi was in their home, appellees usually received $70 to $86 per month from Arkansas Social Services. This was not a part of the income of Rev. Deavers. He will begin drawing Social Security in January 1976.

There is rather convincing evidence that a good relationship exists between Kimmi and appellees. The strongest evidence of reciprocal love was contained in a report by an Assistant Regional Administrator of Arkansas Social Services. He stated that Kimmi "is definitely their 'baby'" and that she is "a quiet, shy little girl who seems to thrive on the attention given her by the Deaverses." The chancellor stated that the affection for the Deaverses shown by the child when she was in the courtroom was impressive. There was testimony from neighbors and acquaintances tending to show that Kimmi was a highly nervous child when she came to the Deavers home, but that she now seems happy and well adjusted and that she is well cared for. The Deavers home is adequately furnished and is equipped with a washer, dryer and deep freeze. Mrs. Deavers does much of her own canning. The child is in kindergarten, where she is doing well, and has several playmates in the immediate vicinity of the Deavers dwelling. She attends Sunday school and church regularly, and goes to the mid-week services in the church Rev. Deavers serves.

In spite of the agreement, appellees both thought they had been assured that foster parents had been permitted to

later adopt children placed in their homes if they otherwise met the requirements of the Social Services Agency. There was some justification for this belief. Delbert Deavers denied signing the agreement, but we agree with the chancellor that the preponderance of the evidence shows that he did, even though he may have forgotten having done so, or may have misunderstood the language.

An adoption specialist for Arkansas Social Services testified that none of the proposed adoptive parents in Fulton County, who had been approved, would be acceptable for a five-year-old child. She stated that the experts on the subject say that the period between the ages of two and four years is very important in a child's personality and general psychic development and that a major change in its living arrangements was disturbing to its sense of security, but her own opinion was at variance with this commonly accepted expertise.

The major objections of the Arkansas Social Services to the adoption are the age differential between the child and the Deaverses, the prospect of overstrictness on the part of the prospective parents because of their religious convictions, and an inclination of the Deaverses to be overprotective. On the other hand, the Family & Children's Services plan to take the child from the h me in which she had been for more than two years before the application for guardianship was filed and place her in another foster home without placing her for adoption for a period of one year. She would be placed under a visitation program calculated to build up a relationship between her and her natural father. The agency would be acting in cooperation with the father in his regaining custody of the child. During the hearing, it was disclosed that Bullock had withdrawn his consent to the adoption after a visit by the proposed guardian. She told him that his consent was the same as saying he did not want the child, prepared and made available to him a form for revocation of this consent, and encouraged him to believe that a plan could be worked out under which he could make a suitable home for the child and regain her custody. This was done with full knowledge that Bullock had previously failed to appear in response to a summons to answer the charge that he had neglected the child

and that he was openly living in Thayer, Missouri, in a meritricious relationship with a woman, even though neither of them had been divorced from a living spouse. An investigation requested by Arkansas Social Services revealed that the woman's two children were already living in that home, that neither Bullock nor the woman seemed ashamed of the situation and that the woman seemed to be quite happy with it. The agency was also aware of the circumstances that caused the chancellor to find that Bullock had abandoned Kimmi. With this knowledge, the nominated guardian promised Bullock that, if he planned to get a divorce and remarry she would ask the Arkansas Social Services to hold up the guardianship for a year, to enable him to make a home for the child. Even in their brief here, appellants say:

> ***The record in this case is replete with the efforts of appellants to return Kimmi Bullock to her natural father, who in this proceeding made an effort to regain his child.

In this case, we do not go so far as to say that the contract clause by which appellees agreed "that we will not attempt to obtain legal custody or adopt this child" is void, as the chancellor did, or that it would not, under any circumstances, be enforceable. We cannot say, however, that the chancellor erred in declining specific performance of this contract. Specific performance is an equitable remedy and courts of equity have some latitude of discretion in granting or withholding that relief, depending upon the equities of the particular case. *James* v. *Medford*, 256 Ark. 1002, 512 S.W. 2d 545; *Cole* v. *Salyers*, 190 Ark. 53, 76 S.W. 2d 669. See also, *Jones* v. *Byrne*, 149 F. 457 (W.D. Ark. 1906), rev. on other points, 159 F. 321 (8th Cir., 1908).

The fact that the agencies involved do allow adoptions by foster parents, and did indicate to appellees that they did, coupled with their circulation of a newsletter to foster parents in the form of a letter from a foster child containing a plea for adoption shows clearly that this particular term of a contract for foster care placement is not always enforced by them. This is a clear recognition that there may be conditions which justify the denial of specific performance of the clause. The

question of enforcement should not be left to the uncontrolled discretion of the contracting agencies. In considering the equities, the chancellor correctly stated that the matter should not be viewed as if the child were a chattel, and that no one, not even a parent, has a proprietary right in the custody of a child. *Larkin v. Pridgett,* 241 Ark. 193, 407 S.W. 2d 374; *Woodson v. Lee,* 221 Ark. 517, 254 S.W. 2d 326; *Coulter v. Sypert,* 78 Ark. 193, 95 S.W. 457. See also, *Mantooth v. Hopkins,* 106 Ark. 197, 153 S.W. 95; *In re Giurbino,* 258 Ark. 277, 524 S.W. 2d 236 (1975). In every case in which the chancery court deals with child custody, even as between parents, the polestar is the best welfare of the child. *Haller v. Haller,* 234 Ark. 984, 356 S.W. 2d 9. As demonstrated by the cited cases and many others, this factor may not be totally conclusive, but it is certainly dominant, and the sovereign power of the state as parens patriae may be exercised through the chancellor to see that the child's interests are protected. When it came to the point of determining whether this child, who came to the Deavers home neglected, abandoned, apparently unloved and mistreated, and highly nervous, be taken from a home where she had been for more than two of the most formative years of her life, where strong ties of love and affection had grown and where she was happy and apparently well adjusted, or whether she be snatched away and kept away from this environment in the fragile hope that the home of her father would become a suitable place for her, we are inclined to believe that the chancellor did act, as he stated, in the child's best interests. We certainly are unable and unwilling to say that his findings in that regard were clearly against the preponderance of the evidence, which we would have to do in order to reverse his decree. We have repeatedly emphasized that there is no case in which the chancellor's superior position, arising from his ability to view the parties involved, is to be accorded greater weight that those in which the future custody of the child is to be determined. *Perez v. Perez,* 256 Ark. 639, 509 S.W. 2d 531; *Cousins v. Smith,* 254 Ark. 28, 491 S.W. 2d 587; *Wilson v. Wilson,* 228 Ark. 789; 310 S.W. 2d 500.

Of course, what we have said has been directed primarily to the chancery court's denial of specific performance, but it applies with almost equal force to the probate court judgment

denying appointment of a guardian of Kimmi. True enough, the probate court is a court of law, not equity, but it is also true that a probate judge is invested with a sound legal discretion in the matter of the appointment of a guardian for a minor, and his action will not be overturned except in case of manifest abuse. *Sadler* v. *Rose*, 18 Ark. 600, *Nelson* v. *Green*, 22 Ark. 367.

Although the statutes are somewhat different from those in effect when the cited cases were decided, the present statutes indicate that the probate court still has discretion in the matter. The petition for appointment of a guardian must state the reasons why the appointment is sought and the interest of the petitioner. Ark. Stat. Ann. § 57-609 (Repl. 1971). The probate court must be satisfied after a hearing that a guardianship is desirable to protect the interests of the incompetent. Ark. Stat. Ann. § 57-614, 616 (Repl. 1971). The scope of our review is the same as it would have been in an equity case. Ark. Stat. Ann. § 62-2016 g (Repl. 1971). The pertinent statutes are indicative of a recognition of discretion in the probate court. We certainly would not reverse an equity case involving an application for guardianship in the absence of a manifest abuse of discretion. We find no abuse here, so we affirm the judgment of the probate court, as well as the decree of the chancery court.