## CINCINNATI LIFE INSURANCE COMPANY and Aon Risk Services, Inc. *v.* Linda MICKLES

CA 03–182                                              148 S.W.3d 768

Court of Appeals of Arkansas
Division IV
Opinion delivered February 25, 2004

[Rehearing denied March 31, 2004.]

*Frye & Boyce, P.A.*, by: *Brian P. Boyce*, for appellant Cincinnati Life Insurance Company.

*Tony L. Wilcox, P.A.*, and *Orr, Scholtens, Willhite & Averitt, PLC*, by: *Chris A. Averitt*, for appellant Aon Risk Services, Inc.

*Gary Eubanks & Associates*, by: *Russell D. Marlin* and *William Gary Holt*, for appellee.

JOHN B. ROBBINS, Judge. A Pulaski County jury found appellant Cincinnati Life Insurance Company liable for bad faith and outrage and appellant Aon Risk Services, Inc., liable for deceit and outrage. Appellee Linda Mickles, the plaintiff below, was awarded $120,000 in compensatory damages, for which each appellant was deemed equally responsible, and $1,000,000 in punitive damages against each appellant individually. On appeal, both appellants challenge the sufficiency of the evidence to support the verdicts against them. Appellant Aon also argues that the trial court erred in instructing the jury on deceit and that the trial court erred in admitting a pretrial deposition into evidence. We affirm the verdicts as to Cincinnati Life but reverse and remand the verdicts against Aon on the basis of the erroneous jury instruction.

Appellant Cincinnati Life Insurance Company (CLIC) sells life insurance policies to persons at their places of employment. Appellant Aon Risk Services, Inc., was CLIC's agent and sent enrollers to various locations around the country for the purpose of soliciting applications.[1] After an enroller completed a set of applications, he would send them to Aon's home office in Georgia. There, Aon employees would look at the applications to make sure they were properly completed and, if so, send them to CLIC. CLIC's underwriting department would then decide whether to issue a policy.

---

[1] Although CLIC contends that Aon was its soliciting agent rather than its general agent, both Aon manager James Foster and CLIC manager Larry Arlen described Aon as a general agent.

On July 23, 1996, CLIC policies were marketed to employees of Chenal Rehabilitation Clinic in Little Rock. Appellee was a minimum-wage worker in the laundry department at the clinic. That day, she completed nine applications for life insurance policies — six on her children and three on her grandchildren. In completing the applications, she verbally communicated information to the enroller, who filled in the blanks. and marked the appropriate boxes on the application.

The application for appellee's son Antonio is the one at issue in this case. It reflects that Antonio was just under twenty-one years old at the time of the application, that he was married, and that he was a full-time student. At the top of the application, the words "Spouse Dependent Grandchild" appear; the word "dependent" is circled. The face amount of the policy applied for originally read $38,942, but that was marked through and the amount of $28,942 was written in its place. The weekly premium amount shown is $3. The application was signed by appellee and by James Foster of Aon as the "Agent Witness."

In the process of executing the applications, appellee questioned the enroller about whether Antonio would qualify for a policy because he was married and did not live with her. She explained that Antonio had a learning disability and could not read or write and qualified for SSI benefits, which she received and distributed to him as needed to pay bills. The enroller assured appellee that Antonio qualified for a policy. According to appellee, the enroller also told her that the policy would pay double indemnity should Antonio's death be accidental.

The application on Antonio was accepted by CLIC, and the policy was delivered in November 1996. On December 17, 1996, Antonio was murdered in Little Rock. Appellee notified CLIC of his death, and CLIC asked her to send a proof-of-death statement and a death certificate, which she did on or about January 9, 1997. The paperwork was received at CLIC by Larry Arlen, the manager of life and health claims. Because Antonio's death had occurred within the two-year contestibility period, Arlen reviewed the claim. He discovered that Antonio's death certificate listed his occupation as a laborer, which did not correspond to the representation on the application that Antonio was a dependent and a full-time student. Arlen decided to send an Equifax investigator to obtain a statement from appellee.

The investigator interviewed appellee and thereafter wrote out a statement, which appellee signed. The statement reflected

that appellee said that Antonio had been married since April 23, 1996; that he had last attended school in 1993; that he had not lived with her since early 1995; and that he "was not my dependent"and "was not a dependent residing with me." Appellee also said, just as she had to the enroller, that Antonio's SSI benefits came to her and that she distributed money to him as he needed it. Further, she said that she had not told the enroller that Antonio was a full-time student.

At about the same time that the Equifax investigation was taking place, Arlen sent a questionnaire to James Foster of Aon, whose name had appeared on the application as the witnessing agent. In his answers dated February 4, 1997, Foster represented that he had taken the application from appellee, that appellee had answered the questions on the application, and that the answers were accurately recorded. At one point, the questionnaire asked: "Did [appellee] tell you Antonio Robinson was a full time student?" Foster did not respond to that question.

On April 3, 1997, CLIC sent a letter to appellee rescinding the policy and refunding $36 in premiums. The letter stated that the application showed that Antonio was a dependent and a full-time student but that CLIC's investigation showed otherwise and, had CLIC known the truth, it would not have issued the policy. On April 10, 1997, appellee wrote a letter to the Arkansas Insurance Department. She stated that somehow CLIC was under the impression that she had told them that Antonio was a full-time student but that she had not; she further said that her son was a dependent, with his SSI check coming to her. CLIC responded to the Insurance Department's inquiry on April 22, 1997. Its letter explained that CLIC policies could be issued only to non-employees under age twenty-three who were full-time students and dependent on the employee; that, at the time of the application, Antonio was not a dependent or a full-time student; and that the policy was issued "due to the misrepresentation of [appellee] on the application."

Thereafter, appellee obtained legal counsel and hired a forensic expert to examine the writing on the application that referred to Antonio as a full-time student. The expert concluded that the handwriting on the words "full time student" was not consistent with the writing on the remainder of the application. Further, the expert could not match appellee's handwriting to the writing on the application. The expert also said that none of the writing on the other eight applications that appellee filled out that

day (which merely used the term "student") matched the writing on "full time student" in Antonio's application. In short, her examination revealed that the words "full time student" were placed on the application by someone other than appellee or the enroller, who had been identified as James Foster.

On July 31, 1998, appellee sued CLIC, James Foster, and Larry Arlen for breach of contract, bad faith, outrage, fraud, and other torts. During the process of discovery, the deposition of James Foster was taken on February 24, 2000. In his deposition, Foster said that, although his signature appeared as witnessing agent on appellee's application, he had never been to Little Rock and had not taken appellee's application. He testified that Aon often hired persons to enroll applicants at various workplace locations; however, he did not know who had been to Little Rock on July 23, 1996. He denied ever having seen the questionnaire from CLIC. Appellee confirmed upon viewing Foster's video-taped deposition that Foster was not the one who had taken her application.

Thereafter, appellee amended her complaint to delete Foster and Arlen as defendants and add Aon. In the final amended complaint, CLIC was sued for bad faith and outrage and Aon was sued for deceit and outrage. Further, appellee alleged that, because Aon was CLIC's general agent, CLIC was liable for Aon's acts. The case went to trial on September 23, 2002, on the issues of bad faith, outrage, and deceit.[2]

We first address the argument presented by both appellants that the trial court should have granted their motions for a directed verdict on the tort of outrage. When reviewing a denial of a motion for a directed verdict, we determine whether the jury's verdict is supported by substantial evidence. *Columbia Nat'l Ins. Co. v. Freeman*, 347 Ark. 423, 64 S.W.3d 720 (2002). Substantial evidence is defined as evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond mere suspicion or conjecture. *Id.* In determining whether substantial evidence exists, the supreme court stated that we should rely upon two crucial principles to avoid invading the province of the jury. First, we consider only the evidence favorable to the successful party below,

---

[2] At some point, just before a trial was scheduled, CLIC tendered $28,942 in policy proceeds, plus interest.

and second, we defer to the jury's resolution of the issue unless we can say that there is no reasonable probability to support the version of the successful party below. *Id.* Additionally, in reviewing the evidence, the weight and value to be given the testimony of the witnesses is a matter within the exclusive province of the jury. *Id.*

Four factors are necessary to establish the tort of outrage. They are: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Faulkner v. Arkansas Children's Hosp.*, 347 Ark. 941, 69 S.W.3d 393 (2002). The type of conduct that meets the standard for outrage must be determined on a case-by-case basis. *Crockett v. Essex Home, Inc.*, 341 Ark. 558, 19 S.W.3d 585 (2000). We require clear-cut proof to establish the elements in outrage cases. *Id.* Merely describing the conduct as outrageous does not make it so. *Id.* Clear-cut proof, however, does not mean proof greater than a preponderance of the evidence. *Id.*

The proof at trial, viewed in the light most favorable to appellee, reveals the following. Appellee was lied to about the identity of the enrolling agent. She testified that he identified himself as James Foster with Cincinnati Life Insurance. In fact, Foster was not in Little Rock when the application was taken. The parties stipulated that the application was probably taken by either Douglas Buehland or Jay Miller, whose last known whereabouts were in Arizona. Neither of these men were licensed in Arkansas as insurance agents. Aon sometimes used independent enrollers to take applications, after which James Foster would sign the application as the witnessing agent. James Foster testified that CLIC was aware of the practice of using outside enrollers other than the one who signed the application because two enrollers were the wife and sister-in-law of a CLIC director.

The CLIC manual, which was provided to enrollers, read in part:

> **Can I insure my spouse and children with a basic cash value life insurance policy?** Yes! Your spouse and/or children who are

under age 23, unmarried, not in military service and dependent upon you for their support are eligible for a separate policy.

Neither the application, the manual, or the policy defined the term "dependent." According to Larry Arlen, CLIC authorized, and in fact relied on, Aon's agents to define the term to the applicant. Arlen himself offered a very broad definition of the term, testifying that, to him, a dependent is someone who requires the help, assistance, and guidance of the person he is depending on in order to survive. Further, the manual said nothing about a requirement that an insured be a full-time student.

When appellee signed the application, nothing was filled in the occupation box. According to the handwriting expert, neither the enroller who filled out the application nor appellee wrote anything in that box. Therefore, the untruthful term "full time student" must have been placed in the box after appellee completed the application process, and the evidence showed that it was either CLIC or Aon who had access to applications at that point. The standard procedure was that, after an enroller completed a set of applications, he would send them to Aon's home office in Georgia. There, an Aon employee would look at the applications to make sure they were properly completed and, if so, send them to the carrier (CLIC). If a block on an application was left blank, Aon would send it back to the employee's workplace for completion, accompanied by a cover letter. Fax and letter reminders would be sent to the employer and, if no response was forthcoming, a letter and phone call would go to the employee. There was no evidence at trial that any such communications had been directed to appellee. In light of these factors, the jury would have been justified in concluding that the application was altered by either CLIC or its agent Aon.

Now we turn to the events that took place after Antonio's death. Upon being informed of his death, CLIC requested a proof of death statement and a death certificate from appellee. When the death certificate showed that Antonio was a laborer, CLIC began an investigation to determine if he was eligible for coverage. In the statement given by appellee to the investigator, she said that Antonio had been married since April 23, 1996; that he had last attended school in 1993; that he had not lived with her since early 1995; and that he "was not my dependent"and "was not a dependent residing with me." Appellee also said, consistent with what she had told the enroller, that Antonio's SSI benefits came to

her and that she distributed money to him as he needed it. Further, she said that she had not told the agent who took her application that Antonio was a full-time student. It is apparent that appellee was truthful in the application process and in the statement to the investigator.

Larry Arlen of CLIC sent a questionnaire to the man who purported to be the enrolling agent, James Foster. Foster lied in the statement, saying that he had completed the application at appellee's workplace and describing who was present. On the crucial question of whether appellee had told him that Antonio was a full-time student, no answer was given.

When these investigative matters were made known to Arlen, he simply grasped onto appellee's statement in the Equifax report that Antonio was not her dependent. He ignored the fact that she said later in the statement that he was not a dependent "residing with me" and ignored Foster's failure to answer the crucial question. Further, Arlen testified that he noticed that the words "full time student" on the application were in different writing from the rest of the application but that this "didn't concern" him. Later, in a letter to the State Insurance Department, Arlen persisted in referring to the application's designation of Antonio as a full-time student and dependent as misrepresentations, despite the fact that the student designation was in different writing and that field agents were given the authority to define who was or was not dependent. Finally, Arlen conducted no further investigation, even after he discovered that Foster had lied about being the enroller in this case.

■ Both CLIC and Aon argue that none of their actions were atrocious enough to merit a verdict for outrage. It is true that, despite judicial recognition of this tort, the courts have addressed it in a cautious manner and have stated that recognition of it is not intended to open the doors of the courts to every slight insult or indignity one must endure in life. *Dillard Dep't Stores, Inc. v. Adams*, 315 Ark. 303, 867 S.W.2d 442 (1993). Rude, aggressive, hateful, rumor-mongering, profane, and name-calling behavior has been held insufficient to support a cause of action for outrage. *See, e.g., Faulkner v. Arkansas Children's Hosp., supra; Stockton v. Sentry Ins.*, 337 Ark. 507, 989 S.W.2d 914 (1999); *City of Green Forest v. Morse*, 316 Ark. 540, 873 S.W.2d 154 (1994); *Webb v. HCA Health Servs.*, 300 Ark. 613, 780 S.W.2d 571 (1989).

We conclude that there was substantial evidence of outrage on the part of both appellants going beyond the rudeness, name-calling, and gossiping described in the other outrage cases cited above. Aon engaged in egregious dishonesty in a manner that it should have known would cause emotional distress to appellee. One of the unlicensed enrollers misidentified himself as James Foster and misled appellee about the amount of her insurance coverage. Further, the evidence would support a finding that an Aon employee altered the application. Moreover, while an investigation of appellee's claim was underway, James Foster lied and concealed pertinent information, thus causing appellee to be cast in a bad light, and wrongfully denied the coverage she sought during an extremely difficult time in her life.

Aon claims that appellee testified that she could not point to any act by Aon that intended to cause her harm. Her exact testimony on cross-examination is as follows:

> QUESTION: Ms. Mickles, there has been a lot said today about outrageous conduct of Aon. Other than what you've testified to here in front of the jury, is there any instance of conduct from Aon, not Cincinnati Life, that supports your claim that they intended to cause you harm?

> ANSWER: I, I only knew I was dealing with Cincinnati.

This testimony does not absolve Aon. First, appellee testified that misrepresentations had been made to her by the person who represented himself to be James Foster. Second, even though appellee did not know the particular company with which her enroller was affiliated, there was sufficient proof presented at trial that the enrollers were sent by Aon.

Aon also argues that appellee failed to prove the level of emotional distress required for an outrage verdict. However, our review of Aon's directed-verdict motion made at trial does not reveal this as a basis for Aon's argument below. Although Aon did raise this argument in its posttrial motion, our supreme court has held that appellate courts should not consider an argument made for the first time in a posttrial motion. *See Lee v. Daniel*, 350 Ark.

466, 91 S.W.3d 464 (2002) (new trial motion); *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002) (JNOV motion).[3]

As for CLIC's conduct, it persisted in claiming, even to the Insurance Department, that there were two misrepresentations on the application. Yet, the very document upon which denial of coverage was based — appellee's application — was altered by either CLIC or its agent Aon in a manner that was material to the risk. Further, the likelihood of illicit alteration was not remote but should have been apparent to CLIC. The handwriting on the application was different, and even though this was noticed by Larry Arlen, he failed to accord it any importance. He also failed to consider that the witnessing agent left his answer blank on the question of what appellee had told him and failed to consider appellee's insistence that she had not told the enroller that Antonio was a student. It has been the law in Arkansas for many years that an insurer cannot void a policy for misrepresentations when the misstatement in the application is the result of the fraud, negligence, or mistake of the agent. *See Neill v. Nationwide Mut. Fire Ins. Co.*, 355 Ark. 474, 139 S.W.3d 484 (2003), and cases cited therein. Further, CLIC continued to insist that appellee had misrepresented Antonio's dependent status, knowing that it relied on its field agents to define who is or is not a dependent.

These factors provide substantial evidence for the jury's finding that CLIC's conduct was outrageous. The evidence shows a willful ignorance of the facts coupled with a grim determination to deny coverage on two grounds that were in fact created by CLIC or its agent.

We turn now to CLIC's argument that the trial court should have directed a verdict in its favor on the bad-faith count. Bad faith requires the establishment of affirmative misconduct by an insurer, without a good-faith defense, which is dishonest, malicious, or oppressive in an attempt to avoid liability under a policy. *Richison v. Boatmen's Ark., Inc.*, 64 Ark. App. 271, 981 S.W.2d 112 (1998). A claim for bad faith cannot be based upon good-faith denial, offers to compromise a claim, or for other honest errors of judgment by the insurer. *Id*. Neither can the claim

---

[3] In any event, appellee and her witnesses testified to her extreme distress upon discovering that she had been deceived and upon being accused of dishonesty in connection with the claim.

be based upon negligence or bad judgment so long as the insurer is acting in good faith. Actual malice means that state of mind under which a person's conduct is characterized by hatred, ill will, or a spirit of revenge; it may be inferred from conduct and surrounding circumstances. *Id.*

We conclude that the jury's bad-faith verdict was supported by much of the same evidence that supported the outrage claim. Therefore, we will not reiterate that evidence here but simply address the specific arguments made by CLIC.

CLIC argues first that there was no evidence that its alleged misconduct was undertaken "for the purpose of avoiding liability under the policy." CLIC is relying on language in numerous cases that define bad faith as an insurer's affirmative misconduct "in an attempt to avoid liability under a policy." CLIC claims that, in this case, most of the alleged misconduct took place at the application stage, before the policy was ever issued, and further that no evidence shows that any alterations were made on the policy after Antonio died. Thus, it contends, it engaged in no misconduct to avoid liability under the policy.

We note at the outset that, in more recent cases, the supreme court has modified the phrase "in an attempt to avoid liability under the policy" to read "in order to avoid a just obligation to its insured." *See Columbia Nat'l Ins. Co. v. Freeman, supra.* In any event, even if bad faith cannot take place until a claim is asserted, CLIC committed acts of bad faith after the claim was asserted by turning a blind eye to clear evidence that appellee had made no misrepresentations and that, in fact, all the evidence pointed to the conclusion that either it or its agent had altered an insured's application. Further, even if the term "full time student" was added to the application before Antonio died, either CLIC or its agent, Aon, made this crucial alteration in a haphazard way, either knowingly or in reckless disregard of the fact that it could later be used to void coverage.

CLIC also argues that any evidence that it altered the application is speculative. We disagree. The evidence supports the conclusion that it was either Aon or CLIC that wrote in the term "full time student" on appellee's application. Further, once it was determined that neither appellee nor the enrolling agent wrote the term on the application, CLIC could only have concluded that the term was filled in either by its agent Aon or by its own employees. CLIC points to testimony that it was a "stickler" about having no

blanks on an application, with the implication being that an application with a blank on it would have been sent back to Aon. The actual testimony is that it was a stickler about the weekly premium amount and that "some carriers" were sticklers about blanks. In any event, CLIC was obviously not perfect in its procedures — it issued this policy even though the application clearly stated that Antonio was married, a fact that should have immediately disqualified him.

Thirdly, CLIC argues that appellee, in her own testimony, acknowledged that the placement of the term "full time student" on the application could have been an honest mistake. CLIC makes too much of this testimony. Appellee said, in response to a question on cross-examination that it was "a possibility" that the person who filled out the application just wrongly assumed that Antonio was a full-time student. She also said as much in her statement to the investigator. However, her statement to the investigator was made before she ever saw the handwriting on the application. In any event, despite appellee's willingness to consider the universe of possibilities, the handwriting expert testified that she could not match the term with either appellee's or the enroller's handwriting, which only left the possibility that the writing was placed there after the application process.

Finally, CLIC argues that bad faith may not be predicated on a failure to investigate. In *Richison, supra*, at 277, we said:

> We conclude that the allegations that Consumer's failed to fully investigate the cause of Richison's death beyond a cursory review of the death certificate and medical records will not support a claim of bad faith. In *Findley v. Time Ins. Co.*, 264 Ark. 647, 573 S.W.2d 908 (1978), the insured alleged, among other things, that the insurer failed to contact her physician or to investigate fully the diagnosis by her treating physician before denying a claim for medical insurance benefits based on false statements on the application for the policy. The supreme court stated that *"had [Findley] claimed that after the investigation by [the insurer] it was determined that claim was valid and [the insurer] nevertheless refused to pay or ... refused to make any investigation at all, and that [the] refusals were in bad faith with an intent to cause further damage to [Findley] a different question would be presented."* The court stated that Findley had not asserted any affirmative action on the part of the insurer that would constitute bad faith or fraud.

(Emphasis added.)

What we have in this case is not a mere failure to investigate. CLIC made a decision to ignore evidence obtained in an investigation that pointed to the applicant's truthfulness and cast doubt on the idea that she had made any misrepresentations. Further, CLIC made a decision to deny coverage when it knew or should have known that it or its agent had inserted the offending information on the application.

■ Based on the foregoing, we affirm the jury's bad-faith verdict against CLIC.

■ Our next issue concerns Aon's claim that the trial judge should have granted its motion for a directed verdict on the deceit count. The essential elements of an action for deceit are as follows: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; (5) damage suffered as a result of the reliance. *Goforth v. Smith*, 338 Ark. 65, 991 S.W.2d 579 (1999). Despite Aon's claim that the burden of proof below was clear and convincing evidence, the burden of proof for fraud in a case at law is by the preponderance of the evidence. *Tyson Foods v. Davis*, 347 Ark. 566, 66 S.W.3d 568 (2002); *Lancaster v. Schilling Motors*, 299 Ark. 365, 772 S.W.2d 349 (1989).

■ We will not unduly burden this opinion with restating the facts that support the deceit count. Suffice it to say that the evidence supports a finding that an employee of Aon made false statements to appellee about his identity, the amount of the policy, and Antonio's status as a dependent, all for the purpose of inducing her to buy a policy; that she was justified in relying on those representations; and that, as a result, she purchased a policy under circumstances that were so fraught with confusion and deception that the coverage she bargained for was later denied. There was therefore substantial evidence to support the jury's verdict for deceit.

The next issue concerns a jury instruction given by the court upon appellee's request on the deceit count against Aon. The instruction was based on AMI 903 and the identical 601, which basically state that violation of a statute may be considered evidence of negligence. Appellee proposed to instruct the jury that a violation of the state insurance licensing statute was evidence of

deceit. The statute that was in effect at the time of the allegedly tortious acts in this case, Ark. Code Ann. § 23-64-201 (Repl. 2001), prohibited a person from soliciting insurance business, taking insurance applications, or placing insurance business without a license. The instruction was given to the jury over Aon's objection. We agree with Aon that the instruction was given in error.

AMI Civ. 4th 903 is designed to instruct a jury that violation of a statute, while not necessarily an act of negligence, may be considered along with other facts and circumstances as evidence of negligence. *Barnes v. Everett*, 351 Ark. 479, 95 S.W.3d 740 (2003). We have found no case, either in Arkansas or any other jurisdiction, in which this type of instruction was approved to instruct a jury that violation of a statute was evidence of deceit. *But see Aetna Cas. & Sure. Co. v. Broadway Arms*, 281 Ark. 128, 135, 664 S.W.2d 463 (1983), stating that violation of the Trade Practices Act is not necessarily evidence of bad faith. Appellee cites *Berkeley Pump Co. v. Reed-Joseph Land Co.*, 279 Ark. 384, 653 S.W.2d 128 (1983), to support the giving of the instruction. There, in a case involving allegations of both fraud and negligence, the trial court instructed the jury that violation of certain UCC provisions regarding deception in the sale of goods, could be considered evidence of negligence. The language in the case is somewhat confusing, seeming to indicate that an AMI 903 instruction would be proper in a fraud case, but the case ultimately affirms only that violation of a statute is evidence of negligence:

> Assuming at a second trial that fraud is established so as to constitute a submissible issue, we find no error in the instruction to the jury framed in terms of AMI 601 and 903. We have often said that violation of a statute is evidence a jury may consider in determining whether a defendant is guilty of negligence.

Id. at 397. Therefore, the case is not helpful to appellee.

We conclude that the instruction was in error because it permitted the jury to make a finding of deceit based solely upon the fact that Aon's enrollers were unlicensed. Deceit or fraud requires scienter, an intent to misrepresent. *See Fidelity Mortgage Co. v. Cook*, 307 Ark. 496, 821 S.W.2d 39 (1991). Violation of this statute is not necessarily the equivalent of an intention to misrepresent. Further, deceit requires the element of justifiable reliance,

which the statute does not address. Thus, despite our holding that there was substantial evidence to justify the jury's deceit verdict, we must reverse on this issue because the giving of an erroneous instruction is presumptively prejudicial. *Frisby v. Agerton Logging, Inc.*, 323 Ark. 508, 915 S.W.2d 718 (1996).

Based on the foregoing, we affirm the jury's verdict as to CLIC and hold that error occurred in the case against Aon. Because the jury's interrogatories rendered only one damage verdict of $120,000, apportioned fifty percent to each defendant, we have no way of ascertaining what portion of that amount is attributable to outrage and what portion is attributable to deceit. Therefore, because we have found error as to one of these counts, we must reverse the entire case against Aon for a new trial. *See Welter v. Curry*, 260 Ark. 287, 539 S.W.2d 264 (1976).

Aon's final argument concerns appellee's use of James Foster's deposition at trial. Aon argues that, because Foster's deposition was taken on February 24, 2000, before Aon was made a party to the lawsuit, it should not have been admitted into evidence against Aon. See Ark. R. Civ. P. 32. The trial court agreed with Aon's argument but solved the problem by giving the jury a limiting instruction, directing them to consider the deposition as evidence only in the case against CLIC. Our affirmance of the jury's verdict as to CLIC and reversal as to Aon makes it unnecessary to address Aon's argument on this point. Foster may be available to testify upon retrial. Further, with the retrial having only Aon as a defendant, this issue should not arise.

The jury's verdict is affirmed in all respects as to appellant CLIC. The verdict on both the outrage and deceit counts against Aon are reversed and remanded.

GRIFFEN and NEAL, JJ., agree.