Larry LEE, Sr. and Barbara Fowler, *Individually* and as
*Parents* and *Next Friends* of Larry Lee, Jr., and
Brandon Fowler, *Minors v.*
Ed DANIEL

01-676                                    91 S.W.3d 464

Supreme Court of Arkansas
Opinion delivered November 7, 2002

*Walker & Dunklin,* by: *Woodson D. Walker;* and *Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando,* by: *Ginger Jenkins* and *Donald Nathaniel Watson,* for appellants.

*McMath, Vehik, Drummond, Harrison & Ledbetter, P.A.,* by: *Paul Harrison* and *Charles Harrison,* for appellee.

TOM GLAZE, Justice. This appeal was certified to this court by the court of appeals on the grounds that it presents a challenge to the constitutionality of Arkansas' attorney's lien statute. Jurisdiction arises under Ark. Sup. Ct. R. 1-2(a)(2).

On June 29, 1995, Barbara Fowler, along with her mother and her two sons, was involved in an automobile collision in Pine Bluff. Fowler's mother, Linda Young, was driving her car when it was struck by a truck owned by Waste Management of Arkansas.

Young was severely injured; Brandon Fowler, the older of the two boys, was not seriously hurt, but the younger boy, eighteen-month-old Larry Lee, Jr., eventually had his right arm amputated as a result. Barbara Fowler was seven months pregnant at the time of the wreck, and had to be medicated to keep from delivering the baby prematurely.

One day after the accident, on June 30, 1995, attorney Ed Daniel met with Fowler in her hospital room. Fowler signed a contract with Daniel, on behalf of herself and her two sons, agreeing to pay him 40% of any recovery or settlement she might receive out of any lawsuit Daniel filed on her behalf. The contract also contained a clause whereby Daniel would be entitled to a lien on any sum recovered by way of settlement or judgment. A few days after signing the contract, Fowler changed her mind about having Daniel represent her, and she terminated his services.

In May or June of 2000, Fowler entered into a tentative settlement with Waste Management, Inc., for the sum of $2,500,000.00. The approval of the probate court was required, because the matter involved the estates of the two minor children. On June 27, 2000, Daniel filed a petition in Jefferson County Probate Court to determine and enforce his attorney's lien on the settlement amount. In response, Fowler filed a petition in the circuit court, where the personal injury lawsuit had been pending, to determine the validity of the lien. Fowler's petition requested that the circuit court find that Daniel was terminated for cause, and that he therefore had no enforceable lien on the proceeds of the settlement. Daniel was granted permission to intervene in that action, and filed a complaint seeking recovery of the $1,000,000.00 he claimed he was owed under his contingency fee contract.

Following a bench trial in November of 2000, the circuit court issued an order setting out various findings of fact and concluding that a valid contract existed between Daniel and Fowler for herself and as guardian of her two sons. Further, the court found that there was no justifiable cause for Fowler's termination

of Daniel's contract. The circuit court concluded that Daniel had a valid attorney's lien against the proposed settlement.[1]

On appeal, Fowler raises three arguments for reversal.[2] She challenges a number of the trial court's findings of fact, and she also asserts that the court erred in refusing to allow her to admit certain expert testimony. Finally, she contends that Arkansas' attorney's lien statute is unconstitutional.

■ For her first point on appeal, Fowler argues that thirteen of the trial court's findings of fact were clearly against the preponderance of the evidence. In a bench trial, this court will not set aside the findings of fact by a circuit judge sitting as a jury unless they are clearly erroneous. *Wood v. The Corner Stone Bank*, 315 Ark. 200, 866 S.W.2d 385 (1993); *Taylor's Marine, Inc. v. Waco Mfg.*, 302 Ark. 521, 792 S.W.2d 286 (1990). *See also* Ark. R. Civ. P. 52. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Forrest Const. v. Milam*, 345 Ark. 1, 43 S.W.3d 140 (2001). This court gives due deference to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. *Pyle v. Sayers*, 344 Ark. 354, 39 S.W.3d 774 (2001). Further, it is within the province of the trier of fact to resolve conflicting testimony. *Myrick v. Myrick*, 339 Ark. 1, 2 S.W.3d 60 (1999).

■ Fowler's first challenge is to the trial court's finding of fact #4, wherein the court stated that "Larry Lee, Jr. was severely injured, Barbara and Brandon Fowler less serious." Fowler contends that the trial court failed to "take proper account" of the emotional trauma she suffered. However, the facts clearly supported the trial court's findings: Larry Lee, Jr., had his arm ampu-

---

[1] In this appeal, the court is concerned only with the validity of the contract and the lien to which it gave rise. The issue of the reasonableness of the amount of Daniel's fee has yet to be determined by the probate court, and we do not address that question here.

[2] Although the named appellants in this case are Larry Lee, Sr., Larry Lee, Jr., and Brandon Fowler, it was Barbara Fowler who signed the contract with Ed Daniel that gave rise to this appeal. For simplicity in writing, we refer to Barbara Fowler as the appellant in this case.

tated following the accident. Indeed, Fowler's brief concedes that she and Brandon Fowler "did not sustain injuries as severe as those sustained by Larry Lee, Jr." The circuit judge's finding of fact was not clearly erroneous.

The remainder of the factual findings that Fowler challenges can be grouped into three general categories: findings of fact that pertain to how Fowler had her initial contact with attorney Ed Daniel; findings relating to Fowler's mental status at the time she signed the contract with Daniel; and findings concerning Fowler's communications with Daniel, including her termination of his services.

The first of these categories — how Fowler initially contacted Daniel — includes five specific findings of fact by the trial court:

#5: On June 30, 1995, a friend of the family, Laverne Hill, discussed with Barbara Fowler and family members Fowler's need for an attorney, and recommended one to Fowler.

#6: Barbara Fowler requested Laverne Hill to get the attorney to call Barbara Fowler.

#8: Laverne Hill was instructed by both Barbara Fowler and David Lisenby [Fowler's uncle] to have attorney Ed Daniel to call Barbara Fowler.

#11: Ed Daniel called Barbara Fowler and was instructed to call her uncle David Lisenby.

#13: On June 30, 1995, David Lisenby called Ed Daniel and asked him to come down and discuss the matter with them, as requested or agreed to by Barbara Fowler.

■ Although Fowler asks this court to conclude that these findings of fact were clearly against the preponderance of the evidence, in her brief she states only that these findings were contradicted by her own testimony. Such argument wholly ignores the fact that other witnesses, including a number of Fowler's family members and family friend Laverne Hill, testified that Hill suggested that Fowler contact Daniel, and that Fowler then asked Hill to have Daniel call Fowler. The resolution of any conflict in the

testimony was for the trial court, and on appeal, we will not over-turn such a finding based on a credibility determination. *See Skokos v. Skokos*, 344 Ark. 420, 40 S.W.3d 768 (2001).

The next general category of factual findings with which Fowler takes issue concerns the trial court's conclusion that Fowler was not so impaired by medications and emotional trauma that she was incapable of executing a valid contract. These three findings are as follows:

> #9: Barbara Fowler appeared to be normal, not acting under the influence of any medication, disillusion [*sic*] from the accident, depression from her injuries [or] her children's injuries, nor the very serious injuries her mother received in the same accident on June 29, 1995.

> #17: The attending family members did not discern any debilitating effects of the accident, medication, or the medical status of Barbara Fowler or any other family members injured in the accident, during the said discussions [with attorney Daniel].

> #18: Barbara Fowler did not appear to be impaired in any way to those [who] attended the meeting, nor was Barbara Fowler pressured or coerced in any way.

Here, Fowler asserts that she offered "uncontroverted testimony" that she had received a battery of medications, both for pain and to prevent a miscarriage, and that she was suffering a great deal of emotional trauma from the circumstances. She notes that her son had to have his arm amputated, and that her mother was in critical condition in the Intensive Care Unit. Further, she points to testimony from her brother, Brad Young, that she appeared "drugged up" and "emotionally unstable," in support of her contention that she lacked the capacity to enter into a valid contract.

Again, however, Fowler fails to acknowledge that there was a surfeit of other testimony from other witnesses that contradicted her own account. For example, Laverne Hill testified that she visited with Fowler, and although Fowler seemed emotional, she appeared to be of a clear mind. Fowler's uncle, David Lisenby,

testified that Fowler seemed to be alert and aware of everything that was going on around her. Emily Lisenby, David's wife, testified that Fowler "knew what was going on very well." Further, although Fowler attempts to rely on her brother's testimony that she "didn't look like she was in it," Brad Young conceded on cross-examination that he had testified at his deposition that he had lied before, that he sometimes had trouble keeping his lies straight, and that Fowler had promised him that, when she got her money out of the settlement, she would give him some. Young was also confronted with his deposition testimony, taken some four weeks prior to trial, wherein he testified that Fowler understood what was going on when she signed the contract.

In addition, testimony offered at trial clearly supported the court's finding that Fowler was not coerced or pressured into signing the contract with Daniel. David Lisenby discussed the facts surrounding the family's first contact with Ed Daniel, stating that when he first spoke to Daniel, Lisenby said the family needed to talk about how they wanted to proceed. After a discussion that included David and Emily Lisenby, Lisenby's sister Annette Irvin, Brad Young, and Fowler, the five of them agreed to call Daniel to come to the hospital to confer with them. Fowler agreed that Lisenby should call Daniel. When Daniel arrived at the hospital in Pine Bluff, he and the above-named family members sat down at a conference table in the ICU waiting room and talked about the accident. At the time, Lisenby said he felt that Fowler understood the purpose of the meeting. The family discussed what had happened during the accident, as well as the fact that Linda Young was still in ICU, and that Larry Lee, Jr.'s arm had to be amputated. Lisenby stated that Daniel was very cooperative in answering the questions from the family, including Fowler's questions, and that everyone was satisfied with the answers Daniel gave. Daniel spoke with the family for at least an hour and a half.

■ Before Fowler signed the contract with Daniel, the family spoke together outside of Daniel's presence. Lisenby and other family members asked Fowler several times if she wanted Daniel to represent her; she repeatedly said that she had not hired anyone else, and wanted to use Daniel. At that point, the family called Daniel back into the conference room, and Daniel went

over the contract with Fowler. David Lisenby testified that Fowler appeared to understand everything that went on, and he also stated that he did not see any duress, coercion, or intimidation exhibited by Daniel at all. The trial judge found the family members' testimony to be more credible than that of Fowler, and again, we will not reverse such a determination on appeal.

Finally, Fowler challenges four findings of fact that discuss the manner in which Fowler terminated Daniel's representation. These findings are as follows:

#29: Ed Daniel had contact with Barbara Fowler by phone [on] Sunday, July 2, 1995, and Barbara did not advise him that [she] was having any misgiving, second thoughts about signing with Daniel, or that he had been treating [her] in a substandard or disrespectful manner.

#30: On July 5, 1995, Ed Daniel visited Barbara Fowler at [Jefferson Regional Medical Center], and Fowler expressed no complaints about Daniel's services or treatment of Fowler.

#34: Fowler did not tell Daniel at the time of termination, nor at anytime subsequent thereto, that Daniel had failed to do anything that he should have done, or that Daniel had done anything improper, offensive, unethical, or anything else that resulted in Fowler's decision to terminate Daniel.

#35: The letter written by Barbara Fowler and Larry Lee, Sr., to Ed Daniel and received on or about July 10, 1995, advising that they did not want Ed Daniel to represent them or the minors, does not set out a reason for discontinuing Ed Daniel's service, other than they preferred the services of another attorney, and because Daniel's fee was 40% of the amount recovered.

■ · Fowler concedes in her brief that the finding numbered 29 is true; therefore, by her own admission, this finding of fact cannot be clearly erroneous. With respect to the remaining three findings, Fowler asserts that they "reflect the trial court's belief that Fowler did not have cause to terminate Daniel because she did not tell him prior to his termination that he had done anything wrong." Fowler maintains that she had no duty to give

Daniel advance notice that she was going to terminate him, and she repeats her contention that Daniel lied to her and coerced her into hiring him.

■ However, as discussed above, there was ample evidence from which the trial court could conclude that Fowler entered into a valid contract with Daniel and did not have cause to terminate him. As we defer to the trial court's resolution of conflicting testimony, we will not reverse the court's findings of fact on any issue raised by Fowler.

■ In her second point on appeal, Fowler asserts that the trial court abused its discretion in excluding the expert testimony of Fowler's witness, Sula Stanfield. A trial court's ruling on the admissibility of expert testimony will not be reversed absent an abuse of discretion. *See Sera v. State*, 341 Ark. 415, 17 S.W.3d 61 (2000). Stanfield was a licensed registered nurse, and Fowler sought to have her testify about the effects of the various medications Fowler took while in the hospital. However, upon voir dire by Daniel, Stanfield conceded that she could not authenticate Fowler's medical records. Daniel objected to both Stanfield's testimony and her use of the medical records. The trial court agreed and directed Stanfield to step down, which she did.

■ We do not reach Fowler's argument that Stanfield should have been permitted to testify, because Fowler failed to proffer Stanfield's testimony. Rule 103 of the Arkansas Rules of Evidence provides that "[e]rror may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of a party of affected, and . . . the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Ark. R. Evid. 103(a)(2). Fowler never proffered the substance of Stanfield's testimony or her opinions as to what possible effects the medication might have had on Fowler's state of mind.

■ This court has repeatedly stated that failure to make an offer of proof precludes review of the issue on appeal. *See Duque v. Oshman's Sporting Goods—Services, Inc.*, 327 Ark. 224, 937 S.W.2d 179 (1997) (failure to proffer evidence so that we can see if prejudice results from its exclusion precludes review of the evi-

dence on appeal); *Carr v. General Motors Corp.*, 322 Ark. 664, 911 S.W.2d 575 (1995) (appellant's failure to proffer the excluded evidence, including the substance of the witness's testimony, precludes this court's reaching the merits of her argument); *National Bank of Commerce v. HCA Health Services of Midwest, Inc.*, 304 Ark. 55, 800 S.W.2d 694 (1990) (Ark. R. Evid. 103(a)(2) requires an offer of proof before alleged error in excluding evidence may be considered on appeal).

Fowler's final point on appeal is that Arkansas' attorney's lien statute, Ark. Code Ann. § 16-22-301 *et seq.*, (Repl. 1999) is unconstitutional as a violation of the separation-of-powers doctrine. Particularly, she contends that the statute is an unlawful intrusion into this court's powers to regulate the practice of attorneys at law. However, we decline to reach this issue, because Fowler failed to preserve it for appellate review.

The trial court's order on Fowler's "Petition to Determine Attorney's Lien" was filed on January 5, 2001. A second order, denying various motions that had been filed by the parties, was entered on January 10, 2001. Fowler did not raise an issue regarding the constitutionality of this statute until her motion for new trial, filed on January 22, 2001. The trial court never ruled on the motion for new trial, and it was therefore deemed denied on February 21, thirty days from the filing of the motion. *See* Ark. R. Civ. P. 59(b).

First, we point out that, when a motion for new trial has been deemed denied in accordance with Ark. R. App. P.—Civ. 4(b)(1), the only appealable matter is the original judgment or order. *See Monk v. Farmers Ins. Co.* 290 Ark. 38, 716 S.W.2d 201 (1986). This court has also repeatedly held that an objection first made in a motion for new trial is not timely. For example, in *Warnock v. Warnock*, 336 Ark. 506, 988 S.W.2d 7 (1999), this court declined to reach an equal protection argument, holding that it would not address a constitutional issue if it was not brought to the trial court's attention for a ruling during trial or at some point prior to the entry of final judgment. In *Selph v. State*, 264 Ark. 197, 570 S.W.2d 256 (1978), this court noted that the reason for requiring an objection before the trial court is to dis-

courage "sandbagging" on the part of lawyers who might otherwise take a chance on a favorable result, and subsequently raise a constitutional claim if the gamble did not pay off. *Selph*, 264 Ark. at 204. *See also Wilson v. Wilson*, 270 Ark. 485, 606 S.W.2d 56 (1980); *Hodges v. State*, 27 Ark. App. 154, 767 S.W.2d 541 (1989) (allowing a party to raise an objection for the first time in a motion for new trial would give them "license to lie behind the log," waiting to see if they obtain an adverse verdict before complaining about any alleged irregularities). Because Fowler failed to raise her constitutional claim until her motion for new trial, the question is not preserved for our review.

For the reasons set forth above, we affirm.

CORBIN and THORNTON, JJ., concur.

ARNOLD, C.J., not participating.

RAY THORNTON, Justice, concurring. The initial contact between Barbara Fowler and Ed Daniel occurred the day following a motor-vehicle accident in Pine Bluff when Daniel, an attorney with offices in Little Rock, called Fowler at the request of a non-family member and testified that he was told by Fowler to discuss the matter with her uncle, David Lisenby. It is not controverted that Fowler did not personally request that Daniel come and see her during their telephone conversation. Nonetheless, Daniel arrived at the hospital in Pine Bluff that evening, sought an audience with Fowler who was either in her hospital bed, or in a wheelchair, receiving medication from an IV tube in her arm to limit pain and to halt untimely labor in order to prevent the premature birth of a child. Daniel sought and obtained her signature on a conditional fee contract for herself, as well as another conditional fee contract for recovery of damages for her child, Larry Lee Jr., who was at that moment recovering from an operation amputating his right arm as a result of the collision. A third contract was signed for her other less severely injured child. Larry Lee Jr.'s father, Larry Lee Sr., did not participate in the execution of this conditional fee contract on behalf of his minor child.

It is not controverted that Daniel was terminated as an attorney within a week. It is not disputed that Daniel's efforts on behalf of Fowler consisted of not more than a few hours of work, including the mailing of a notice of his attorney's lien to Waste Management of Arkansas on the Saturday following the Friday night signatures on the conditional fee contracts. Now Daniel asserts a lien in the amount of one million dollars as an attorney's fee based upon virtually no performance of services.

As expressed by counsel for appellants in oral argument, "this case, in the final analysis, presents the unique and troubling question of whether this state's attorney's lien statute [Ark. Code Ann. § 16-22-301 *et seq.* (Repl. 1999)] permits an attorney to recover a fee of one million after having rendered virtually no services to the clients."

The attorney's lien statute was passed in response to our decision in *Henry, Walden & Davis v. Goodman,* 294 Ark. 25, 741 S.W.2d 233 (1987) (limiting recovery on a terminated conditional fee contract to quantum merit). The General Assembly stated that the court's interpretation of the law "is contrary to what was intended by the enactment of . . . the Attorney Lien Law." Act 293 of 1989. The statute further provides, "Therefore it is the intent of [this section] to allow an attorney to obtain a lien for services based upon his or her agreement with his or her client and to provide compensation in case of a settlement or compromise without the consent of the attorney." Ark. Code Ann. § 16-22-301.

As stated by the majority opinion, this court accepted review to consider whether this legislative enactment seeking to overturn our decision in *Goodman, supra* violated the principles of separation of powers. I concur with the majority that the issue of the constitutionality of the statute is not before us because Fowler did not preserve it for appellate review. This issue, like that of the reasonableness of the proposed fee, is simply not addressed by our decision in the case before us. In my opinion, it is clear that these issues may be raised in any subsequent or continuing action seeking to enforce a one million dollar conditional fee proposed to be charged for work not performed.

As the issue of the interpretation and constitutionality of Ark. Code Ann. § 16-22-301 *et seq.* is not before us for review, the trial court's ruling that there was no good cause for termination of the contract is irrelevant to the disposition of the matters under consideration, and that issue should be deferred pending further development. During oral argument, counsel for appellee expressed his views on whether a one million dollar attorney's fee would be ordered on remand.

A member of the court asked, "Are you saying that Mr. Daniel is entitled to forty percent of the contract?" Counsel for Mr. Daniel candidly responded:

> In this particular case, no your honor, we are not. I don't think anyone would come before this court and suggest that the probate judge is going to award 40% of the settlement proceeds to Mr. Daniel and 33 1/3% and a rather large cost bill to the other [attorneys], as well. That would be in excess of $1.8 million out of a $2.5 million settlement. Practically speaking, I don't see any probability that the probate judge is going to satisfy both of these contracts in their entirety.

I note that the majority, by an appropriate footnote, has indicated that the reasonableness of the amount of Daniel's fee remains to be determined by the probate court upon our remand for further consideration.

In summary, I concur that we should not reverse as clearly erroneous the trial court's findings that a conditional fee contract was executed, that a lien was perfected, and that Daniels was subsequently fired. I only wish to emphasize that today's opinion does not establish the reasonableness of a one million dollar fee, or resolve the issue whether this court has authority under principles of separation of powers to exercise our constitutional authority to regulate the practice of law, including the determination of the reasonableness of fees.

CORBIN, J., joins.