Laurie MARTIN *v.* Robert DECKER, Mary Ann Daley, Estate of Collette Weth, and Jeff Weth

CA 05-1190 237 S.W.3d 502

Court of Appeals of Arkansas
Opinion delivered June 28, 2006

*Mary Thomason*, for appellant.

*Vickery & Carroll, P.A.*, by: *Robin J. Carroll*, for appellee Robert Decker.

ANDREE LAYTON ROAF, Judge. Mary Ann Daley's brother, Robert Decker, and her daughter, Laurie Martin, both sought to be appointed guardian of her person and estate. The trial court found Daley to be incompetent and determined it was in her best interest to have Decker appointed as guardian of her person, with a financial institution to be appointed guardian of her estate. Martin appeals, asserting that the trial court committed clear error because, in guardianship cases, the pertinent statutes manifest an intent for children to have preference over siblings. We affirm.

Mary Ann Daley, who suffered a stroke in September 2001 resided in the Beverly Nursing Home facility in El Dorado, Arkansas; she was wheelchair-bound and was diagnosed with dementia of Alzheimer's type and serious memory and reasoning problems. Daley also possessed substantial financial resources. Daley's daughter, Collette Weth, obtained a power of attorney in

January 2002, to take care of Daley's financial obligations and to make sure that the nursing home provided proper care and treatment. Weth died in May of 2003. At that time, Weth's sister, Laurie Martin, a resident of California who had been estranged from Daley for some years, took over handling Daley's personal and financial affairs pursuant to durable powers of attorney she obtained.

Daley is a one-third shareholder in Decker's Cash Depot, a company started by her brother Robert Decker, who resides in Omaha, Nebraska. Daley received substantial payments from this investment, but in 2003, after Martin took over her affairs, Decker decreased Daley's income from the previous years' $103,629 to $48,936. Upon Weth's death, Decker refused to deal with Martin, started drawing a higher salary, and had Daley removed from the board of directors. In April 2004, Decker made an offer to purchase Daley's interest in Decker's Cash Depot for $150,000; Martin rejected this offer on behalf of her mother. On May 13, 2004, Decker filed his petition for appointment of guardianship, claiming that Daley did not have the ability to make decisions regarding her care and finances.

Daley retained counsel, and in response to Decker's petition, requested that Decker's petition be dismissed, but in the alternative, that the court consider her desire and preference in appointing a guardian of her estate and guardian of her person. Martin also filed a response, requesting that she be appointed as guardian of her mother's estate and person.

A hearing was held on the matter on April 19, 2005. Decker orally amended his petition to request that he only be appointed guardian of the person and that the court appoint a financial institute as guardian of the estate. Daley testified that she currently lived in Little Rock and that she never was a resident of the Beverly Nursing Home, but just knew people there. She stated that she did not really want to have a guardian because she believed that she could handle her own affairs, but that she would take one if the court deemed that she could not handle them herself. She further stated that if the judge found a guardian to be necessary, she would prefer the court to choose "one of my people whom I'm close to and so forth. Like my daughter-in-law." Daley also stated that she had three children, "Collette, Laurie, who is dead, and my son Michael." She then stated that it was Collette who had died. Daley later testified that she currently paid her own bills and took

care of her own finances and that she would prefer her daughter Laurie be over her person and be over paying her bills and money when it is necessary.

Decker testified that his relationship with his sister had been good over the years. He stated that he asked Daley to invest in Decker's Cash Depot in 1995, and that she had subsequently received about $700,000 in income for her initial $63,000 investment. He testified that he paid Daley about $6,000 per month once the business started making a good cash flow and that currently, by vote of the board, he and his partner took a larger salary. He further testified that he had some concern over the years about paying Daley large sums of cash, and that he simply did not want to make payments to Laurie, noting that he had talked to her only about four or five times in twenty-five years.

Decker had worked closely with Collette in caring for Daley after her stroke in 2001, paid to have Daley taken to El Dorado where Collette lived, and together with Collette arranged for her to be placed in the Beverly Nursing Home. Decker stated that he was aware that Collette had had a drug problem, but that she was getting back on her feet. In addition, he stated that Daley and Martin had a period of estrangement from sometime around 2000 up until Collette's death, because Martin allegedly stole $46,000 out of a lock box that Daley forgot to put her name on and then moved to California and did not invite Daley to her second wedding. In addition, Martin had apparently been cut out of Daley's will, with the bulk of Daley's estate to go to Collette and her children. Decker said that he believed Martin got a power of attorney over Daley's affairs strictly for the money.

Decker went on to testify that he planned to place Daley in a private room in a nursing facility in Omaha, Nebraska, where he and Daley grew up and Daley still had some friends and extended family. He stated that when he first saw Martin at the nursing home after Collette's death, she accused him of trying to steal his sister's money and that he had refused to deal with Martin since. He also alleged that Martin had restricted his access to visitation with Daley and that he probably would not be allowed to visit his sister if Laurie took her back to California.

Laurie Martin testified that she had, indeed, become estranged from her mother for a period of time, but that until that time, she and her mother had been very close and she would visit for lunch almost everyday when she lived in Little Rock. She

stated that she could not remember exactly what was said, but that she and her mother had a falling out and her mother said some hurtful things that she took to heart and that she chose to stop speaking with her mother. She stated that she did not invite her mother to her second wedding and that she regretted that decision very much. She also stated that she continued to communicate with her mother on behalf of her two children and that she sent gifts in the children's names. She claimed that she began to miss her mother terribly in 2002, so she flew back to Little Rock to reconcile with Daley. Further testimony revealed that Laurie was essentially estranged from most of her family for many years. She stated that she cut her father out of her life after he admitted to having an affair and that her brother and sister had suffered from drug and alcohol problems for most of their lives; she also claimed to be frightened of her father and made rather serious allegations against him during the hearing.

Martin admitted that Daley and Decker had a very good brother and sister relationship and stated that she never restricted his visitation with Daley, but only requested that he not be allowed to take Daley off the nursing home premises because she feared he would kidnap her mother and take her to Omaha. She stated that she would take her mother back to California and place her in a good nursing home, and that Daley would be surrounded by her grandchildren. She also stated that she wished to be guardian of Daley's estate, in addition to guardian of the person, because she would perform her services for free and she did not want her mother to have to pay for the services of a financial institution.

The court heard testimony concerning Daley's financial assets and her stay at the Beverly Nursing Home from several other witnesses, including Daley's ex-husband and Martin's father, Robert Daley, who testified that he believed Decker would make a better guardian because Martin was probably more motivated by greed and spite, and that he believed Martin did not reconcile with Daley until after Weth died.

At the conclusion of the hearing, the court authorized Martin to take Daley back to California for a visit so that Daley could attend her granddaughter's high school graduation. On July 7, 2005, the court issued its order, finding that Daley was clearly incompetent and incapable of handling her own personal and business affairs, specifically noting that Daley could not remember the name of her bank, the location of her stocks and bonds, the disposition of her jewelry and furniture, and the names and ages of

her grandchildren or whether they had visited her recently. The court then found Decker to be more suitable as a guardian, stating that he had been in business with Daley for many years and "had a consistent interest in her well-being, staying in touch with her, with Collette Weth while she was alive, and traveling with her when she was healthy." The court further noted that Decker has had a close relationship with Daley for a long time, stating that he took care of Daley after her stroke in 2001 and that, from Omaha, he had regular contact with the nursing home personnel and the doctor about Daley's medical care and treatment.

The court's order further noted that Martin was estranged from her mother for a period of time, that Martin did not invite her mother to her wedding, that Martin was estranged from her father to the point of not letting him see or visit with her children, and that once Martin reentered her mother's life, she cut Decker off from visiting his sister in the nursing home and accused him of stealing from her mother in their business affairs. The court also found that Daley had lived in Omaha for many years and still had friends and family there, but that Daley had never lived in California, and that Decker would secure a private room in Omaha and, unlike Martin, would impose no restrictions on Daley's visitation. In the end, the court felt that it would be in Daley's best interests to have Decker appointed as guardian of her person. A reputable financial institution was to be appointed as guardian of the estate, and on October 7, 2005, Wachovia Securities was appointed to serve in this capacity.

On July 8, 2005, Martin filed a motion for reconsideration, noting that Daley had traveled with her to California and had been placed in a nursing facility where her physical condition had improved and her relationship with Martin and her children had become quite close. Attached to the motion was a physician's letter noting the general improvement of Daley's physical condition and suggesting that Daley be allowed to remain in California and continue to receive her care there. Martin filed a notice of appeal on August 3, 2005. After thirty days, the court still had not entered an order on the motion for reconsideration, and it was deemed denied.

On appeal, Martin asserts that the trial court clearly erred in determining that Daley's brother was better suited to serve as guardian than her own daughter. She does not challenge the trial court's appointment of a bank as guardian of Daley's estate.

Probate cases are generally reviewed *de novo*, and this court does not reverse a trial court's findings unless they are clearly erroneous. *Dillard v. Nix*, 345 Ark. 215, 45 S.W.3d 359 (2001). However, subject to statutory restrictions, the selection of a guardian is a matter largely committed to the sound discretion of the appointing court. *McCartney v. Merchant's and Planters Bank*, 227 Ark. 80, 296 S.W.2d 407 (1956). This is a standard of review that accords greater deference to the trial court than the clearly-erroneous standard. The appellate courts will not reverse an equity case involving an application of guardianship in the absence of a manifest abuse of discretion. *Knight v. Deavers*, 259 Ark. 45, 531 S.W.2d 252 (1976). Nevertheless, without regard to the standard of review employed in this case, we cannot say that the trial court either erred or abused its discretion in the selection of Decker as guardian.

A person is qualified to be appointed guardian of the person and of the estate of an incapacitated person if he or she is a natural person who is a resident of this state and is eighteen or more years of age, of sound mind, and not a convicted and unpardoned felon. Ark. Code Ann. § 28-65-203(a) (Supp. 2005). A nonresident natural person with all of the other enumerated qualifications is qualified for appointment if he or she had appointed a resident agent to accept service of process in any action or suit with respect to the guardianship and has caused the appointment to be filed with the court. Ark. Code Ann. § 28-65-203(e). In addition, a bank or similar financial institution with trust powers is qualified to serve as guardian of the estate of an incompetent person. Ark. Code Ann. § 28-65-203(d)(2).

In guardianship cases, the court shall appoint as guardian of an incapacitated person "the one most suitable who is willing to serve." Ark. Code Ann. § 28-65-204(b) (Supp. 2005). In making its determination, the court shall give due regard to the "relationship by blood or marriage to the person for whom guardianship is sought. Ark. Code Ann. § 28-65-204(b)(4). In addition, prior to the appointment of a guardian, the court shall consider "any request made by the incapacitated person concerning his or her preference regarding the person to be appointed guardian." Ark. Code Ann. § 28-65-204(c).

■ Martin's first sub-point is that the court erred because it did not consider Daley's preference to have Martin appointed as guardian of her person and estate. Under the statute, preference is only one factor that the court should consider. The statute does

not mandate an ironclad order of preference, but leaves the appointment of a guardian who would forward the best interests of the incompetent to the sound discretion of the court. *Moore v. Dallas*, 6 Ark. App. 10, 636 S.W.2d 881 (1982). In addition, there is no indication here that the court did not consider Daley's preference, especially in light of the fact that she appeared generally confused, and especially confused as to her preference. At first she requested that her daughter-in-law be appointed guardian. Then she stated that she preferred her guardian be her sister-in-law, Laurie. Then she stated that her daughter Laurie had died. Later in the proceedings, she requested that Laurie be the guardian of her person and her estate. The statute only requires the court to consider preference of the incompetent, but the court does not have to be bound by that preference.

▮ Martin next suggests that the court erred in appointing Decker as guardian of the person because of his financial conflicts with Daley. Citing a number of Illinois cases, Martin states that the guardian of a disabled person must be free from any interest which would prevent or impair the proper assertion or protection of the incompetent's rights; specifically, evidence of bad faith in prior dealings between the proposed guardian and the incompetent should preclude his or her selection as guardian. *In re Estate of Robertson*, 144 Ill. App. 3d 701, 494 N.E.2d 562 (1986). However, the majority of the cases cited by Martin deal with people who have been appointed as guardian of the estate as well as of the person. *See Robertson, supra; In re Estate of Lamont*, 13 Ill. App. 3d 714, 300 N.E.2d 574 (1973); *Proehl v. Leadley*, 86 Ill. App. 2d 472, 230 N.E.2d 516 (1967). Martin cites *In re Estate of Bania*, 130 Ill. App. 3d 36, 473 N.E.2d 489 (1984), for the proposition that conflicting pecuniary interests should also preclude the appointment of a guardian. However, in *Bania*, the court refused to appoint appellant as guardian of an incompetent because she failed to testify as to her motives and freedom from self-interest and did not explain a trip to the bank where the incompetent kept $150,000 to $200,000. The court reiterated that the main concern should be the best interest and well-being of the incompetent, regardless of his or her purported preference. *Id.*

Martin asserts that, in retaliation for her taking over her mother's business affairs, Decker raised his own salary and correspondingly reduced her mother's income. In addition, she claims that he tried to cheat her mother out of her interest in the business

by offering to buy her shares at a reduced rate. Decker freely admitted that once Martin obtained power of attorney, he did not want to deal with her, so he took legal steps to have Daley's role in the business minimized. However, Decker also testified that he had had a good working relationship with Collette and that he had more money than his sister and would never attempt to steal anything from her. Unlike in *Bania*, Decker testified as to any apparent inconsistencies in his financial dealings with Daley and had taken proper measures to insure that Daley's money from the business was accounted for. In addition, Decker also took appropriate steps to guard against any seeming financial impropriety when he requested that a neutral financial institution be appointed as guardian of Daley's estate. Martin's argument cuts both ways because testimony revealed that Martin had been cut out of Daley's will and that Martin's estrangement from her mother had been precipitated by Martin absconding to California with $46,000 of her mother's money.

&#9646; Martin's next sub-point is that Arkansas law shows a clear preference for children over siblings, citing Ark. Code Ann § 28-9-214, which mandates that when a person dies intestate, children are first to inherit the estate. However, the probate statutes regarding inheritance have nothing to do with the appointment of a guardian. The basic rule of statutory construction provides that in considering the meaning and effect of a statute, words are given their ordinary and usually accepted meaning in common language, *Yamaha Motor Corp. v. Richards Honda*, 344 Ark. 44, 38 S.W.3d 356 (2001), and Ark. Code Ann. § 28-65-204 simply states that the court should give due regard to the blood relationship of the proposed guardian and the incompetent. As stated previously, the statute provides no mandatory order of priority.

In *McCartney, supra*, the question presented was whether the probate court abused its discretion in appointing a bank as the guardian of the person and estate of the incompetent. McCartney, a sister of the incompetent, had sought to be appointed as guardian; in addition, the incompetent's adopted son had also sought to be appointed. *Id.* The trial court found that McCartney had shown continuous love and care for her sister, while the adopted son had let years pass by without seeing his mother or inquiring of her condition; thus, as between the two, McCartney was better qualified to serve as guardian, but selected a neutral third party in light of the dispute between McCartney and the adopted son. *Id.*

The supreme court found that the guardianship statute did not make an ironclad order of priority, but left it up to the court to select a guardian who would best serve the interests of the incompetent. *Id.* Our supreme court went on to note that while it is the usual practice to appoint the next of kin or a close blood relative as guardian because of the presumption that the next of kin is more likely to treat the incompetent with patience and affection than a stranger,

> the court is not necessarily bound to appoint next of kin or close relatives or the nominees of such blood relatives, for the court, keeping in mind the principle of law that the best interests of the incompetent are paramount, may, in the exercise of the discretion confided in it with respect to the appointment of guardians, appoint a stranger where to do so would be for the best interests of the incompetent in view of such factors as the adverse interests of the relatives and the incompetent, lack of business ability of the relative, and various other matters to be further noted.

*Id.* (citing 21 A.L.R.2d 880).

In *McCartney*, the court reiterated the trial court's wide discretion in appointing a guardian, relative or not, who will best serve the interests of the incompetent. Other cases have likewise illustrated that the courts usually show no preference for one relative over another in guardianship cases. *See Monroe, supra* (affirming appointment of maternal grandfather as guardian of minor child over the paternal uncle); *Bogan v. Ark. First Nat'l Bank of Hot Springs*, 249 Ark. 840, 462 S.W.2d 203 (1971) (affirming appointment of bank as guardian of the estate of an incompetent wife over the husband, finding that the statute conferred no absolute right to appointment on the husband).

 Here, the court made clear findings as to why it believed it would be in Daley's best interest to have Decker serve as guardian of her person, namely, that Daley and Decker had a loving brother and sister bond; that they had a long history of working well in a business enterprise; that Decker had been a constant in Daley's life, and had helped Weth in providing for Daley's care; that Martin had a long period of estrangement from her mother; and that once Martin reentered Daley's life, she made it difficult for others, especially Decker, to see her mother, and often made wild accusations of theft. In fact, the evidence showed that although Martin had once had very close relationships with

both her mother and father, she was essentially estranged from her entire family, and had kept her children away from them. In addition, evidence revealed that Martin may have stolen $46,000 from her mother and that she failed to invite either of her parents to her second wedding.

■ For her final sub-point, Martin asserts that Decker is seventy-two years of age, and that, at forty-six, she is clearly more suited to handle the physical requirements of caring for her mother. This argument was not preserved at trial level, and an appellant must raise and make an argument at trial in order to preserve it on appeal. *Lee v. Daniel*, 350 Ark. 466, 91 S.W.3d 464 (2002). Even so, Ark. Code Ann. § 28-65-203 contemplates no age limit, and only requires that the person wishing to serve as guardian be over the age of eighteen and be of sound mind. Here, there was no testimony that Mr. Decker's age or health had ever or would interfere with the care he could provide for his sister.

Affirmed.

GLADWIN, GRIFFEN, NEAL, and VAUGHT, JJ., agree.

HART, J., dissents.

JOSEPHINE LINKER HART, Judge, dissenting. It is black-letter law that "a finding is clearly erroneous when, although there is evidence to support it, we are left on the entire evidence with a firm conviction that a mistake has been committed." *E.g., Fischer v. Kinzalow*, 88 Ark. App. 307, 198 S.W.3d 555 (2004). I do not recall a case in which I have ever had a firmer conviction that a mistake has been committed.

First, I agree with Laurie Martin's argument that the trial judge erred by failing to consider Mary Ann's preference, as required by Arkansas Code Annotated section 28-65-204(c) (Repl. 2004). While it is true that Ms. Daley exhibited some confusion in court, which was likely due in no small part because she was nervous about testifying, as she herself noted, the trial court's finding that she was "incapacitated mentally to such an extent that she is incapable of handling her personal and business affairs" simply does not address her stated preference for her guardian. This finding, while certainly sufficient to justify the appointment of a guardian — which is not contested — is not, as the majority apparently believes, tantamount to saying that she was incapable of stating a preference for her guardian, which she

unequivocally did in open court. Contrary to the majority's opinion, Ms. Daley was not found to be "incompetent." It is obvious from the record that Ms. Daley's mental capacity was demonstrated to be far greater than the ward in *McCartney v. Merchants & Planters Bank*, 227 Ark. 80, 296 S.W.2d 497 (1956), the precedent the majority so heavily relies on, where the ward was described simply as a "hopeless mental case." Finally, while Ms. Daley did express some confusion about Martin's title, she nonetheless consistently maintained her preference for the person who was present in court — Laurie Martin — to serve as her guardian. Significantly, she never indicated in any way that she wanted Decker to be her guardian even though he too was in court. It is remarkable that the majority can denigrate Ms. Daley's mental functioning on the one hand, and not have the ability to see what was obvious to Ms. Daley despite her supposed diminished capacity.

Moreover, I cannot ignore the fact that on June 6, 2003, with the assistance of counsel, Ms. Daley granted Laurie Martin durable powers of attorney to make health care and financial decisions for her. There is no evidence in this record that Ms. Daley was incapable of stating her preference for Martin at that time, and it strongly corroborates the validity of her in-court declaration of preference. It is axiomatic that such an erroneous application of law constitutes a manifest abuse of discretion. *See, e.g., Seeco, Inc. v. Hales*, 334 Ark. 134, 969 S.W.2d 193 (1998). Ignoring the statutory requirement that Ms. Daley's preference for Martin be considered is therefore a manifest abuse of discretion.

Even if I could accept the propriety of the majority undertaking its own fact finding, and I assume for the purposes of this discussion that they are correct in finding that Ms. Daley's preference was irrelevant, I certainly cannot accept the findings that the trial judge made to justify his decision. The trial judge found Decker "more suitable" because Decker had been in business with her "for a number of years" and had a consistent interest in her well-being, stayed in touch with her and with Weth, and traveled with her "when she was healthy." The trial judge also found that Decker put Mary Ann in a nursing home after her stroke. Finding Decker's business relationship with Ms. Daley weighed in favor of appointing him as her guardian is at best fanciful, if not down right absurd. By Decker's own testimony, he and his former girlfriend manipulated their majority ownership of the business venture that Ms. Daley had a one-third interest in to remove her from the board

of directors and to cut off the income stream that she had previously enjoyed while simultaneously increasing their own salaries as board members by approximately $3,000 each per month, despite Decker's own candid admission that he did not actually work in the business.[1]

Regarding Decker's supposed "staying in touch," by his own admission, Decker's contact with Ms. Daley was episodic at best for most of his adult life. The trips that he took with Ms. Daley, three total, occurred nearly a decade before the guardianship proceeding, and lasted for a mere matter of days. Finally, there is no basis for the trial court to conclude that Decker put Ms. Daley in the nursing home because Decker himself, as well as Susan Stogsdill, the business-office manager for the nursing home where Ms. Daley resided, testified that Weth, not Decker, checked Ms. Daley into the facility on November 12, 2001.

No more convincing are the trial judge's findings that attempt to justify his conclusion that Martin is a less suitable candidate for guardian than Decker. Specifically, the trial judge found that Martin "was estranged from her mother for a period of time," and Martin did not invite her mother to her second wedding. He also found that when Martin re-entered her mother's life, she "cut off Robert Decker from visiting Mary Ann Daley in the nursing home and from talking to her doctors." The trial court also noted that Martin accused Decker of "stealing from her mother in their business affairs." The court also found that while Mary Ann has never lived in California, she "lived in Omaha many years ago and has friends there together with two of Robert Decker's children and his ex-wife who is a friend of Mary Ann Daley" and unlike Martin, Decker would impose no restrictions on Mary Ann's visitation. I have no doubt that these findings are clearly erroneous.

The findings that justify the trial judge's decision that Martin would be less suitable are no more justifiable. Regarding Martin's estrangement from her mother, it had ended long before Decker instituted the guardianship proceeding, and their reconciliation is

---

[1] Although we cannot weigh evidence on review, I believe it is worth noting that in contrast to what was proved by Decker's own admission that he had manipulated the distribution of profits to deny Mary Ann any further return on her investment, there was uncontroverted evidence that Martin faithfully and scrupulously took care of Ms. Daley's financial affairs.

proven by Ms. Daley giving Martin the powers of attorney. As far as Martin restricting visitation, evidence was conflicting on this issue, and the only person that Martin clearly tried to exclude from the nursing home was a lawyer hired by Weth's ex-husband who was trying to get Ms. Daley to execute a new will that would more strongly favor Weth's children. As far as Martin accusing Decker of stealing from Ms. Daley in their business affairs, it is well documented in the evidence, and admitted by Decker, that he took her off the board and redistributed the money that Ms. Daley had previously received to himself and his former girlfriend in the form of salaries, even though neither of them actually work in the business. Given these undisputed facts, the trial judge should not have faulted a lay person like Martin for interpreting Decker's actions as "stealing." The majority's crediting of testimony by Decker that he "had taken proper measures to insure that Daley's money from the business was accounted for" is laughable, but I submit, probably accurate; Decker will have to pay income tax on that money because he took it as a salary. I cannot understand why the majority feels that Ms. Daley has gotten more than her fair share from her investment. In the first place, from Decker's own testimony we know that Decker only offered her the opportunity to invest in his company because he could not obtain a bank loan. Secondly, Decker and the other shareholder, Decker's former girlfriend, who each contributed an amount of capital equal to Ms. Daley's contribution for the formation of the business, realized even more from their investment. Does the majority suggest that the Walton family would be justified in asking those fortunate souls who invested in Wal-Mart stock forty years ago to turn in their stock because they have made enough money already?

Finally, the trial judge's finding that Omaha would be a superior place for Ms. Daley to serve out the remaining years of her life because she had lived there forty years ago and would be visited by Decker, Decker's ex-wife, and friends that she had not seen since the mid-1960s, rather than near her daughter and grandchildren in California, is simply incredible. Taken together, after wading through this lengthy record, I am left with a firm conviction that a mistake had been made.

I think it bears noting that while the majority cites Decker's testimony that Martin had taken $46,000 from Ms. Daley's lock box, it should be given no weight. This bald accusation was belied by the fact that the signature cards from Ms. Daley's safety-deposit boxes, which were admitted into evidence over Decker's strenu-

ous objections, showed that Martin did not have access to the boxes and could not have taken anything from the boxes. Not surprisingly, the trial judge made no mention of this obviously spurious allegation, and the majority should avoid finding it credible where the trial judge obviously did not. This is but another example of the majority's invasion of the province of the trial court, making not only findings, but findings based on credibility determinations that the trial court obviously did not subscribe to because it was clearly refuted by documentary evidence.

Finally, it is worth noting that Decker's last-second motion to amend his guardianship petition to have a bank appointed guardian of the estate is nothing more than clever lawyering. By statute, the "reputable financial institution" that the trial judge ordered to be appointed guardian of Ms. Daley's estate is charged only with protecting the existing assets, not attempting to draw more assets into the estate by mounting a shareholders' suit against Decker for keeping Ms. Daley from realizing any more income from her investment. *See* Ark. Code Ann. § 28-65-301(b)(1) (Repl. 2004).[2] This tactic does not show personal concern for Ms. Daley or effectively insulate her from Daley's obvious conflict of interest, but rather insures that no one looks at the financial aspect of the Decker's business practices prior to the appointment of the guardian of the estate.

I cannot agree with the majority that Decker's appointment as guardian was in Ms. Daley's best interest. Therefore, I respectfully dissent.

---

[2] Ark. Code Ann. § 28-65-301(b)(1) lists the duties of the guardian of the estate and are stated as follows:

It shall be the duty of the guardian of the estate:

(A) To exercise due care to protect and preserve it;

(B) To invest it and apply it as provided in this chapter;

(C) To account for it faithfully;

(D) To perform all other duties required of him or her by law; and

(E) At the termination of the guardianship, to deliver the assets of the ward to the persons entitled to them.