Cite as 2022 Ark. App. 112

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-21-24

| | |
|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF KM, A MINOR | Opinion Delivered March 9, 2022 |
| WANNETTA AKERS-TRASK AND ROGER TRASK<br>APPELLANTS | APPEAL FROM THE RANDOLPH COUNTY CIRCUIT COURT [NO. 61PR-20-48] |
| V. | HONORABLE MICHELLE C. HUFF, JUDGE |
| ASHLEY MALONE-DURHAM AND ARIEL MALONE-DURHAM<br>APPELLEES | AFFIRMED |

## BRANDON J. HARRISON, Chief Judge

Wannetta Akers-Trask and her husband, Roger Trask, appeal the Randolph County Circuit Court's appointment of Ashley and Ariel Malone-Durham as guardians of the Trasks' granddaughter, KM. The Trasks argue that the circuit court erred in not according them statutory preference as KM's relatives and in not considering the wishes of KM's parents. We affirm the circuit court's order.

In June 2020, Ariel and Ashley petitioned for the appointment of a temporary and permanent guardianship of twenty-month-old KM. The petition explained that Ariel and Jessie Dooley, KM's mother, had been coworkers and that Jessie and KM's father, Kyle McBride, had left KM in Ariel and Ashley's care beginning in June 2019. Jessie asked Ariel and Ashley to watch KM for one night, which soon progressed to every weekend and then four or five days a week. While Ariel and Ashley had KM, Jessie and Kyle were abusing

drugs, and both expressed suicidal thoughts. The petition asserted that Jessie and Kyle were unfit and that KM faced imminent danger with her parents; therefore, Ariel and Ashley should be appointed temporary and permanent guardians of KM.

The circuit court granted temporary guardianship to Ariel and Ashley via an ex parte order and set a hearing for 20 July 2020. On July 20, Kyle's mother, Wannetta Akers-Trask, filed a letter with the court asking to be appointed KM's guardian. She explained that she has custody of Kyle's three-year-old son, OM; that KM has a "firm relationship" with both her and OM; that she was willing to do whatever was necessary to establish the guardianship; and that while she currently resides in Illinois, she understands that KM's care and maintenance would be reported to the Arkansas court.

The circuit court entered an order on July 21 appointing Ariel and Ashley KM's temporary guardians. The court found Jessie and Kyle unfit but granted them supervised reasonable visitation. Wannetta was also granted reasonable visitation. Finally, the order reflected that communication with Jessie and Kyle should be addressed to Wannetta's address in Illinois.

On August 20, Wannetta and her husband, Roger Trask, counterpetitioned for appointment as KM's guardians. They alleged that KM was residing with "babysitters who are not biologically or by family related to" KM. They also explained that Jessie and Kyle had consented in writing to Wannetta and Roger acting as KM's guardians and that there were several other family members on both sides of KM's family that live near their home. They asserted they have a stable home and the financial means to meet KM's needs.

The circuit court convened a hearing to determine KM's permanent guardian on 8

September 2020. Wannetta testified that she lives in Jerseyville, Illinois, approximately four hours away. She visited Jessie and Kyle at least every other weekend after KM was born, and she never saw any signs of drug abuse by either parent. Her visits had later dropped off to once a month or once every couple of months, and she had not realized Ariel and Ashley essentially had custody of KM until April 2020. Wannetta agreed that she had spoken to Ariel and Ashley and that they told her they would be filing for a guardianship, but she denied saying that she and Roger were not physically able to take care of another toddler and that she would rather see KM with Ariel and Ashley than with Jessie and Kyle. She reluctantly admitted that she suspected Kyle was using drugs before the July 2020 hearing, but she testified at that hearing that the parents were clean because she had "no proof that they were not." Wannetta also agreed that Ariel and Ashley are good people but said that she didn't know them that well. She also claimed that after the July hearing, Ariel and Ashley "pushed [her] out" by limiting her visitation; that she was allowed visitation time on Saturday and Sunday every other weekend; and that she did not participate in the visitation because "[t]hey wouldn't let me keep her the whole weekend."

On cross-examination, Wannetta said that she and Roger have a close relationship with KM and that "[i]n the first year" they spent holidays and birthdays with her. She also described a weekend trip to the lake in August 2020 where KM was able to spend time with her half siblings OM and KE (Jessie's nine-year-old daughter who lives with her father in Jerseyville). Wannetta described the siblings as "inseparable." She said that she planned to enroll KM in the same daycare that OM attends and that KM would have medical insurance either through the state or through Wannetta's employer. Wannetta opined,

3

I think that [KM] needs to be raised around her family. We have a very large family in Illinois that is willing to help us out and step up in any way, shape, or form that is needed. [KE] is there; [OM] is there, her two siblings. And then she has another half-brother. His name is [B]. He lives not far, about half an hour, 45 minutes from our house. He has been adopted by a loving couple. And she will have access to all of her cousins on her mother's side of the family as well. So she will be able to grow up with her family and be able to know her family.

Ashley testified that she and Ariel have been married almost a year and that they began keeping KM in late July or early August 2019. They offered to keep KM on a Thursday night, agreed to keep her the next night, and then did not hear from KM's parents until Monday. After that, they began keeping her "pretty much every weekend." Eventually, it became four or five days a week, and that later turned into months. Ashley described numerous texts that she and Ariel received from Jessie and Kyle describing eating mushrooms to get high and using methamphetamine. She said that she and Ariel view KM as their daughter and "love her more than anything else and want absolutely what is best for her." She agreed that they had restricted visitation somewhat to minimize KM's possible exposure to COVID-19. According to Ashley, the only visitation time Wannetta asked for was the weekend lake trip in August. Ashley explained that if she and Ariel were granted the guardianship, they planned to maintain KM's relationship with Wannetta and OM.

Ashley described a telephone conversation that she and Ariel had with Wannetta on 7 June 2020 that Ashley had recorded. In that conversation, Wannetta stated, "I can't physically take on another toddler. . . . [W]e know that you are taking care of her. . . . I would rather see her with you guys than with them at this point in time." Wannetta also commented on Jessie's sister visiting Jessie, saying that "they are probably doing heroin," and Wannetta stated that OM had seen Kyle "beat the crap out of Jessie." They also

4

discussed Ashley and Ariel pursuing a guardianship:

ARIEL:        We have the means and the will to, you know, move forward
              with this, you know. But we just wanted to make sure that that
              wouldn't cause like an issue with you or anything like that to
              where it would be like a fight or anything of that nature, you
              know.  That's why we wanted to come to you.

ASHLEY:       Because we still want to keep you in the picture.

ARIEL:        Yes. For sure. No doubt.

ASHLEY:       We don't want to cross you in any way because we know that
              you are still family and you will care for her when you do have
              her, you know.

WANNETTA:  As long as you don't try to keep me away from her.

ASHLEY:       Oh, no.  We would never do that. Just anytime that you would
              want her, you would be more than welcome to get her.  We
              would meet you, whatever the case may be.  Because no matter
              what, we know that in the long run something needs to be
              done.  Like, we can't just keep going on the way that we are
              going on.  Because if we don't do something about it, there is
              no telling where she is going to end up. And then I will really
              never be able to live with that knowing that we could have
              done something to prevent it.

Wannetta later assured Ariel and Ashley that "[i]f something happens though and you guys

don't get her, I would step in."

In making its ruling from the bench, the court remarked that the situation was "akin

to a DHS matter" and that if it was a DHS matter, "then deference is certainly given to

family members.  And I have certainly given that very serious consideration because a

guardianship may or may not be permanent."  The court expressed concern with Wannetta's

not previously acknowledging her son's drug problem and possibly turning a blind eye to

the situation.  The court explained,

I cannot forget the testimony that I heard. And I am not ordinarily a big fan of recording people surreptitiously. But I did hear the testimony that [Wannetta] was not physically able, nor her husband, to take on another toddler at this time. This is a problem, ma'am, because you are 59 years old and your husband is 70. And you have already got one toddler.

. . . .

I understand that you were in agreement that—you said you were in agreement if they are doing what we think they are doing, that they are better off with y'all, which was definitely true. But sometimes I know as is often the case with the parents and kind of the case with these parents, nobody wants to—everybody is fine to let someone else take the bull by the horns or take care of the children until there is a piece of paper that says somebody has custody or guardianship. And I really don't understand that.

And I am struggling to understand why when you suspected that there was a problem, why you then didn't stop what you were doing and come get her unless—and I don't fault you for this at all—but you actually just were not able. Because it is a—I mean, it would be a huge undertaking with the two of them there[.]

And I do understand, you know, that you—and you said this on more than once, I think, on that tape that you did not want to be cut out of [KM]'s life. And that's understandable. But your son and the child's mother left this child with these ladies; and they have been raising her. And after considering all this and even the fact that they are not blood kin, I do think that that is in her best interest at this time; and I am going to leave her with them. But I am going to give you regular minimum visitation. And if you guys can work something out that's more, that's wonderful.

The circuit court entered a written order appointing Ashley and Ariel as KM's guardians on 23 September 2020, and Wannetta and Roger have timely appealed.

Our appellate courts review guardianship proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Martin v. Decker*, 96 Ark. App. 45, 237 S.W.3d 502 (2006). However, subject to statutory restrictions, the selection of a guardian is a matter largely committed to the sound discretion of the appointing court. *Id*. This standard of review accords greater deference to the circuit court

than the clearly erroneous standard. The appellate courts will not reverse an equity case involving an application of guardianship in the absence of a manifest abuse of discretion. *Id*. When reviewing the proceedings, we give due regard to the opportunity and superior position of the circuit court to determine the credibility of the witnesses. *Spurling v. Est. of Reed*, 2018 Ark. App. 185, 544 S.W.3d 119.

Arkansas Code Annotated section 28-65-204(b) (Repl. 2012) provides that the circuit court shall appoint as guardian of an incapacitated person the one most suitable who is willing to serve, having due regard to:

> (1) Any request contained in a will or other written instrument executed by the parent or by the legal custodian of a minor child for the appointment of a person as guardian of the minor child;
>
> (2) Any request for the appointment of a person as his or her guardian made by a minor fourteen (14) years of age or over;
>
> (3) Any request for the appointment of a person made by the spouse of an incapacitated person;
>
> (4) The relationship by blood or marriage to the person for whom guardianship is sought.

When the incapacitated person is a minor, the key factor in determining guardianship is the best interest of the child. *Fletcher v. Scorza*, 2010 Ark. 64, 359 S.W.3d 413. The statute does not make an ironclad order of priority, rather it leaves to the circuit court's sound discretion the appointment of a guardian who would forward the best interest of the ward; and this action will not be overturned except in a case of manifest abuse. *Martin, supra*.

The Trasks argue that the circuit court did not address the "preferences" in § 28-65-204(b) and that the court's comments indicated it thought family members are given preference only in DHS cases. But, they argue, "All other things being equal, the general

7

rule of law is that the next of kin, rather than strangers, are preferred as guardians over children." *McLain v. Short*, 144 Ark. 600, 603, 224 S.W. 428, 429 (1920).[1] The Trasks also contend that the circuit court never considered the preference of the parents, despite the language in the statute that the court should consider any request in a written instrument executed by the parents. In this case, Jessie and Kyle both executed a consent to joint guardianship in favor of the Trasks. For these reasons, they assert, the circuit court should be reversed.

In response, the Malone-Durhams note that the only preference listed in § 28-65-204 is in subsection (a), which instructs that the parents of an unmarried minor, or either of them, if qualified and, in the opinion of the court, suitable, shall be preferred over all others for appointment as guardian of the person. Subsection (b), in contrast, is not a list of preferences but instead enumerates certain factors for the circuit court to consider when deciding on a guardian. The Malone-Durhams deny that the Trasks are the preferred guardians because they are blood relatives or because Jessie and Kyle executed consents in the Trasks' favor. Even if such a statutory preference existed, our supreme court has held that any inclination to appoint a parent or relative must be subservient to the principle that the child's interest is of paramount consideration. *Blunt v. Cartwright*, 342 Ark. 662, 30 S.W.3d 737 (2000).

In reply, the Trasks make the argument that the circuit court did not make a best-interest finding. This assertion is belied by the quoted portion of the circuit court's ruling

---

[1]We note that *McLain* was decided before the passage of Ark. Stat. Ann. § 57-608, the precursor to Ark. Code Ann. § 28-65-204.

above, which states, "And after considering all this and even the fact that they are not blood kin, I do think that that is in her best interest at this time; and I am going to leave her with them." The Trasks develop no argument, nor do they cite any supporting authority for the assertion that a lack of a written best-interest finding in the order appointing permanent guardians is reversible error. *See also Wilson v. Wilson*, 2013 Ark. App. 759, 431 S.W.3d 369 (holding that in order to comply with the statute governing guardianship, a circuit court's order need not contain magic words if it is obvious that the circuit court considered the child's best interest).

We agree that § 28-65-204(b) does not designate preferences but instead requires the court to give "due regard" to certain factors. The court stated that it gave the Trasks' relationship with KM "serious consideration" in making its decision, and the court acknowledged the consent documents executed by Jessie and Kyle and introduced at the hearing. Further, the circuit court overruled an objection asking that the consents not be considered because Jessie and Kyle had been found unfit. We hold that the circuit court did not abuse its discretion in appointing Ariel and Ashley as KM's guardians.

Affirmed.

ABRAMSON and GLADWIN, JJ., agree.

*Richard E. Worsham*, for appellant.

*Murphy, Thompson, Arnold, Skinner & Castleberry*, by: *Kenneth P. "Casey" Castleberry*; and *Grider Law Firm, PLC*, by: *M. Joseph Grider*, for appellees.

9